177 So.2d 221 (1965)
Rose M. FOLEY and James S. Foley, her husband, Petitioners,
v.
WEAVER DRUGS, INC., a Florida corporation, Respondent.
No. 32357.
Supreme Court of Florida.
April 28, 1965.
Rehearing Denied May 31, 1965.
*222 James C. Shepherd, Green & Hastings, and Samuel Z. Goldman, Miami, for petitioners.
Dean, Adams & Fischer, Miami, for respondent.
ROBERTS, Justice.
This cause is before the court on petition for certiorari to review a decision of the District Court of Appeal, Third District, Foley v. Weaver Drugs, Inc., 146 So.2d 631, upon an alleged conflict with a decision of the District Court of Appeal, Second District, in Canada Dry Bottling Co. of Florida, Inc. v. Shaw, Fla.App. 1960, 118 So.2d 840.
The decision of the Third District Court of Appeal brought here for review is an order of affirmance without opinion. So, we are confronted at the outset with the problem that has, since the decision in Lake v. Lake, 103 So.2d 639, troubled this court when a per curiam decision without opinion of a district court is brought here for review, and whether or not such decision by the district court is reviewable here by conflict certiorari.
The decision in the Lake case was rendered in 1958, not long after revised Article V of our Constitution, F.S.A., became effective and before the new appellate court system created thereby was in "full swing." It was there held that a "per curiam" decision without opinion of a district court of appeal would not be reviewed by this court upon petition for certiorari based on our "direct conflict" jurisdiction except in those rare cases where the "restricted examination required in proceedings in certiorari" revealed that "a conflict had arisen with resulting injustice to the immediate litigant." This was some seven years ago; and it would seem that, by now, the jurisdictional question presented in such a case could be answered almost on a "cut-and-dried" basis. Unfortunately, however, the question remains just as troublesome now as it was when the Lake case was decided. We have deemed it advisable, therefore, to take a new look at the problems inherent in the review by this court, on a "direct *223 conflict" petition for certiorari, of a "per curiam" decision without opinion of a district court of appeal and to re-examine the decision in the Lake case as to this matter.
This court obviously formulated the policy with respect to such decisions, as in the Lake case, in the thought that such decisions would, for the most part, be confined to their traditional function of disposing of an appeal where the point of law involved "is so clear that it is not considered necessary to elaborate it by an extended discussion," Newmons v. Lake Worth Drainage District, Fla. 1956, 87 So.2d 49, so that in most cases no actual conflict could be found to exist, and that to require this court to "dig into a record" to determine whether there was a conflict would, in effect, "give the petitioner an unauthorized second day in an appellate court when he had already had the one day the Constitution has given him," South Florida Hospital Corp. v. McCrea, Fla. 1960, 118 So.2d 25.
In the almost seven years since Lake was decided, hundreds of decisions of the district courts of appeal have been brought here for review under our "direct conflict" jurisdiction. Not an inconsiderable number of these have been "per curiam" decisions; and it goes without saying that, in each such case, the petitioner strongly urged that his was an exceptional case and thus entitled to review under the exception stated in the Lake decision, referred to above. In each of such cases, some members of the court have examined the "record proper"  meaning the written record of the proceedings in the court under review except the report of the testimony  to determine the probable existence of a direct conflict and whether such conflict resulted in "injustice to the immediate litigant" sufficient to invoke the exercise of our power of review under the exception noted in the Lake case. In most cases the petition was simply denied without opinion  and, occasionally, with a dissenting opinion. See Donoghue v. Beeler, Fla. 1963, 149 So.2d 534. In others, we have found probable conflict and have remanded the cause to the appellate court with the request that an opinion be written setting forth the theory, reasoning and authorities upon which it based its per curiam judgment. See Rosenthal v. Scott, Fla. 1961, 131 So.2d 480; State v. Bruno, 104 So.2d 588. (A similar procedure was followed in Snedeker v. Vernmar, Ltd., Fla. 1962, 139 So.2d 682, where probable jurisdiction of a constitutional question, on an appeal directly from the trial court, was made to appear.)
We have also reviewed the "record proper" of a per curiam decision of an appellate court claimed to be in conflict with a later decision of another court of appeal and have exercised our "conflict jurisdiction" to make uniform and harmonious the law on the particular point involved in the two decisions. See Fidelity Construction Co. v. Arthur J. Collins & Son, Inc., Fla. 1961, 130 So.2d 612. We there said:
"There exists a prima facie conflict between the two decisions upon the pivotal point of law and on closely related facts, and one which is in this instance nonetheless direct because of the failure of the court to write an opinion in the Shirey case [Shirey v. Thompson, Fla.App., 115 So.2d 203] to substantiate its decision therein."
It appears, therefore, that in actual practice this court has not been relieved of any substantial portion of its workload by the policy announced in the Lake case respecting per curiam decisions. The only practical distinction between our review of a per curiam decision without opinion, and one that is supported by an opinion, is that in the former, we go directly to the "record proper" to determine probable jurisdiction, whereas in the latter case we "examine the opinion [where the opinion disposes of the questions presented for review] upon which the district court of appeal decision is based, and if the opinion, on its face, shows the probable existence of a direct conflict between the two decisions, on the same point of law, the writ of certiorari *224 may issue and, after study, may be discharged, or the decision of the district court of appeal may be quashed or modified to the end that any direct conflict between the decisions on the same point of law may be reconciled." [Bracketed portion supplied.) Seaboard Airline Railroad Co. v. Branham, Fla. 1958, 104 So.2d 356.
Nor is there any legal distinction between the effect of a per curiam decision without opinion, and one that is supported by an opinion, so that one is not entitled to and should not be given any more "verity" than the other. It is the judgment which constitutes the decision in litigated cases, and the opinion merely sets forth the reasons supporting the judgment, but where there is an opinion we have held that it becomes a part of the decision. See Zirin v. Charles Pfizer & Co., 128 So.2d 594, 596; and Seaboard Airline Railroad Co. v. Branham, supra. As stated by the late and revered Justice Terrell in Newmons v. Lake Worth Drainage District, supra, 87 So.2d 49:
"Traditionally it may be pointed out that a `per curiam' is the opinion of the court in which the judges are all of one mind and the question involved is so clear that it is not considered necessary to elaborate it by an extended discussion. Such an opinion carries no less weight because of the nomenclature that designates it as such." (Emphasis supplied.)
and as pointed out by Mr. Justice Hobson (Ret.) in his dissenting opinion in Donoghue v. Beeler, supra, 149 So.2d, at page 536, in a number of cases considerable reliance has apparently been placed on such decisions, citing many decisions of this court and of the district courts of appeal in support of his statement.
Our duty, as the "supervisory body in the judicial system" of this state, Ansin v. Thurston, Fla. 1958, 101 So.2d 808, 810, is to maintain uniformity and harmony in the decisions of our appellate courts, and to resolve the conflict created by a decision which is, "out of harmony with a prior decision of this Court or another Court of Appeal on the same point, thereby generating confusion and instability among the precedents." Kyle v. Kyle, Fla. 1962, 139 So.2d 885, 887. As stated in Lake v. Lake, supra, 103 So.2d 639, 642:
"To remain stable, the law administered by the Supreme Court and the district courts of appeal must be harmonious and uniform. Were there not a central authority to keep it so it could happen that a district court of appeal would decide a given question of law one way and another district court of appeal another way, or one of them contrary to a former decision of the Supreme Court, through oversight or inadvertence, resulting in obvious confusion. To forestall any uncertainty that might derive from such situations, however infrequent, the provision was included in the amendment."
In State ex rel. Gordon, Relator v. Trimble et al. (Judges constituting the Kansas City Court of Appeal), 318 Mo. 341, 300 S.W. 475, the Missouri court said:
"Respondents [district court] did not discuss this rule, but their opinion approving the action of the trial court in sustaining the demurrer to the evidence offered in support of relator's counterclaim necessarily involved such a ruling. In State ex rel. Boeving v. Cox, 310 Mo. 367, 276 S.W. 869, we held that a Court of Appeals will be regarded as having decided a question consistently with the judgment rendered, whether or not it discussed the question in its opinion, if the decision of such question was necessarily involved and must have been decided consistently with the judgment before the conclusion reached could be logically and reasonably reached.
"Respondents could not have affirmed the action of the trial court in sustaining the bank's demurrer to the evidence *225 on relator's counterclaim without in fact holding that relator was not entitled to have his testimony of an agreement to repay taken as true and that he was not entitled to the benefit of every inference legitimately to be drawn therefrom.
"Even if relator has not specifically assigned this conflict of opinion, it is our clear duty to notice it when its existence comes to our attention. State ex rel. Missouri Gas & Electric Co. v. Trimble, 307 Mo. 536, loc. cit. 552, 271 S.W. 43; State ex rel. Shawhan v. Ellison, 273 Mo. 218, loc. cit. 228, 200 S.W. 1042; State ex rel. Vulgamott v. Trimble, 300 Mo. 92, loc. cit. 101, 253 S.W. 1014."
In State of Minnesota v. National Tea Co., 309 U.S. 551, 60 S.Ct. 676, 84 L.Ed. 920, the Supreme Court of the United States said:
"It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions. But it is equally important that ambiguous or obscure adjudications by state courts do not stand as barriers to a determination by this Court of the validity under the federal constitution of state action. Intelligent exercise of our appellate powers compels us to ask for the elimination of the obscurities and ambiguities from the opinions in such cases. Only then can we ascertain whether or not our jurisdiction to review should be invoked. Only by that procedure can the responsibility for striking down or upholding state legislation be fairly placed. For no other course assures that important federal issues, such as have been argued here, will reach this Court for adjudication; that state courts will not be the final arbiters of important issues under the federal constitution; and that we will not encroach on the constitutional jurisdiction of the states. This is not a mere technical rule nor a rule for our convenience. It touches the division of authority between state courts and this Court and is of equal importance to each. Only by such explicitness can the highest courts of the states and this Court keep within the bounds of their respective jurisdictions."
Compare also Blackburn v. State of Alabama, 354 U.S. 393, 77 S.Ct. 1098, 1 L.Ed.2d 1423.
Upon reconsideration of this entire matter, we have concluded that our appellate court decisions may be kept truly harmonious and uniform only by giving to the per curiam decisions without opinion of such courts the same "verity" that we give to their decisions supported by an opinion. By subjecting such per curiam decisions to the same scrutiny on the "record proper"  that is, the written record of the proceedings in the court under review except the report of the testimony  as we give to the opinion upon which a district court of appeal decision is based, it may be concluded that a direct conflict exists which may forthwith be resolved by this court; or such scrutiny may show "the probable existence of a direct conflict between the two decisions", Seaboard Airline Railroad Co. v. Branham, supra, which can definitely be determined only by remanding the cause to the appellate court with the request that a supporting opinion be written. This is what we have, in fact, been doing heretofore. And we think the jurisprudence of this state will be best served by modifying the policy as to per curiam decisions announced in Lake v. Lake, supra. We hereby do so, and we hold that this court may review by conflict certiorari a per curiam judgment of affirmance without opinion where an examination of the record proper discloses that the legal effect of such per curiam affirmance is to create conflict with a decision of this court or another district court of appeal.
Nor can we escape that in common parlance, an affirmance without opinion of a trial court by a district court is generally deemed to be an approval of the judgment *226 of the trial court, and becomes a precedent, certainly, in the trial court rendering the judgment.
Probable jurisdiction having been made to appear, oral argument was heard on the questions of jurisdiction and merits, following which we invited the District Court of Appeal, Third District, to assist us by the preparing and adopting of an opinion setting forth the theory and reasoning upon which their Per Curiam Decision of Affirmance had been based, and relinquished to that court, temporarily, jurisdiction to do so. See Foley v. Weaver Drugs, Inc., Fla. 1964, 168 So.2d 749. Surprisingly, that court refused our request in their opinion filed February 16, 1965. We have not yet extended our rule-making authority under Section 3, Article V, Constitution of Florida[1] to the point of requiring an opinion in all decisions, as is required in some states, and thus we have no choice but to proceed with the matter without the benefit of the views of the District Court of Appeal.
Having disposed of the jurisdictional question, we turn now to the merits of the instant petition for the writ of certiorari.
The record shows that, on October 17, 1959, James S. Foley purchased from Weaver Drugs, Inc., the respondent here, at one of its retail stores, a bottle of Revlon reducing pills, better known as "Thin Down", for use by his wife, Rose M. Foley. The pills were packed in a glass bottle which closed with a screw-on top. The day after the purchase Mrs. Foley attempted to open the bottle by unscrewing the top when the bottle broke, fragmented, and one piece thereof lacerated her right wrist.
Predicated upon these facts the Foleys instituted an action against Revlon, Inc., the manufacturer, and Weaver Drugs, Inc., the retail-seller, setting forth the facts and their respective damages, and alleging causes of action for negligence and for breach of implied warranty of fitness and merchantability against each defendant.
Weaver Drugs, Inc. moved to dismiss and strike from the complaint every theory of action against it. Ruling on this motion was reserved by the court until pre-trial hearing. Defendant Weaver Drugs, Inc. then filed its answer to the complaint, denying the allegations of the complaint as they apply to it. At the pre-trial conference the court struck all allegations relating to implied warranty as against the defendant Weaver Drugs, Inc., the effect of which was to hold that neither of the plaintiffs had a cause of action against the retailer based on an implied warranty. Thereafter, on motion of the defendant Weaver, the court granted a summary judgment in favor of this defendant on the cause of action for negligence alleged by the plaintiffs. A motion for summary judgment filed by the defendant Revlon, Inc., was denied.
On appeal by plaintiffs to the District Court of Appeal, Third District, the court affirmed, without opinion, the actions of the trial court with respect to the defendant Weaver Drugs, Inc., thereby holding, in effect, that neither of the plaintiffs had a cause of action against the defendant retailer for breach of an implied warranty of fitness and merchantability, and also holding, in effect, that they were not entitled to damages on the theory of negligence; but the action of the appellate court in this respect is not complained of in the instant proceeding.
As noted above, the plaintiffs have invoked this court's "conflict jurisdiction" to review the adverse decision of the appellate court, alleging that it directly conflicts with a decision of the District Court of Appeal, Second District, in Canada Dry Bottling Co. of Florida, Inc. v. Shaw, Fla.App. 1960, 118 So.2d 840. In that case the injured party purchased a bottle of Canada Dry soda from a retail grocer, Food Fair, and took it home. Shortly thereafter, while attempting *227 to open the bottle on a wall opener in the usual manner, it broke and injured her hand. She filed suit against both the bottler, Canada Dry, and the retailer, Food Fair, on the theory of breach of implied warranty of fitness. A jury verdict and judgment against both defendants was appealed and was affirmed by the appellate court. The rationale of the appellate court's decision was that the strict liability of the retailer for breach of an implied warranty of wholesomeness and fitness applicable to products sold for human consumption, sold by him should be extended to include the bottle, as well as its contents, in a case of this kind. In so holding, the court said:
"It is universally known that when one purchases a bottle of Canada Dry Club Soda it will be opened preparatory to use. If, as here, the proof at trial shows that when the purchaser in the process of opening a bottle was injured by a defect therein, she is entitled to an implied warranty of fitness for use as held by the lower court."
The court said that it would not, at that time, extend the doctrine of implied warranty to all containers of food, but that "in this case the bottle and its contents are so closely related that it is difficult  if not impossible  to draw a distinction."
It is clear that the decision in the instant case, holding that the plaintiffs had no cause of action against the retailer for breach of an implied warranty of fitness and merchantability, is in direct conflict with the Canada Dry case, insofar as the plaintiff husband, who was in privity with the retailer, is concerned. Thus, we have jurisdiction to determine the question of the implied-warranty liability, in general, of a retail-seller of a product sold in a container for injury caused by the container.
This exact question has not heretofore been presented to this court. We have held the bottler liable upon an implied warranty of fitness in a suit by the purchaser-consumer of the beverage who was injured by a deleterious substance (broken glass) contained therein. Florida Coca-Cola Bottling Co. v. Jordan, Fla. 1953, 62 So.2d 910. And it is, of course, well settled, as noted by the court in the Canada Dry case, that both the retail-seller and the manufacturer of foodstuffs sold in a sealed container are liable to the consumer, upon an implied warranty of fitness and wholesomeness, for injuries caused by unwholesome or deleterious susbtances therein. See Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313 (manufacturer and packer of tinned meat); Sencer v. Carl's Market, Fla. 1950, 45 So.2d 671 (retail-seller of canned sardines). See also Cliett v. Lauderdale Biltmore Corporation, Fla. 1949, 39 So.2d 476, in which a restaurant proprietor was held liable, on the theory of implied warranty of fitness of the food served by him, to a customer who became ill after eating unwholesome food served to him in the defendant's dining room.
As stated in the Cliett case, supra, and reaffirmed in Sencer v. Carl's Market, supra, 45 So.2d 671, 672:
"These cases establish the principle that as to items of food or other products in the original package which are offered for sale for human consumption or use generally, a person who purchases such items in reliance upon the express or implied condition or assurance that they are wholesome and fit for the uses or purposes for which they are advertised or sold, and who is in-injured as the result of unwholesome or deleterious substances therein which are unknown to the buyer, may hold either the manufacturer or the retailer liable in damages for injuries sustained by him, on the theory of an implied warranty of wholesomeness or fitness of such article or product for the purposes for which it was offered to the public." (Emphasis added.)
But other than in the case of foodstuffs, we know of no decision of this court imposing *228 liability upon a retail seller of a product upon the theory of implied warranty, except under established common-law principles. In Lambert v. Sistrunk, Fla. 1952, 58 So.2d 434, we pointed out that the "implied warranty" theory of liability of a seller was an exception to the maxim, "Let the buyer beware," and that
"To come into play, the exception must therefore spring from some moral obligation on the part of the seller, or perhaps more accurately, on the breach of some such duty amounting to fraud or the taking advantage of the buyer by reason of some superior knowledge in the seller, or the reliance by the buyer on the seller's judgment."
Cf. Smith v. Burdine's, 1940, 144 Fla. 500, 198 So. 223, 131 A.L.R. 115, and McBurnette v. Playground Equipment Corp., Fla. 1962, 137 So.2d 563, in which retail sellers were held liable on the theory of breach of implied warranty of fitness under the rule that the seller is subject to such an implied warranty where the buyer relies upon the seller's judgment of the fitness of a particular article for the purpose intended.
The rationale of our decisions extending to the retail-seller of food products the absolute liability imposed upon the manufacturer of such products, upon the theory of an implied warranty of fitness and whole-someness, is that neither the retail-purchaser nor the retail-seller can discover that a particular item of food enclosed in a sealed container is defective; that the retail-seller is in a superior position to that of the consumer since he is experienced in buying from the manufacturers, is acquainted with the products and the manufacturers and relies upon the reputation of the manufacturers in stocking such food items; so that, in this area of wholesome food which is of vital concern to the public, the retailer should be held to the same liability as the manufacturer as a matter of public policy. See Sencer v. Carl's Market, supra, 45 So.2d 671. It was pointed out, in a specially concurring opinion, that in many cases the manufacturer of a food product was located in a foreign country beyond the reach of the consumer, that the retailer has a right of indemnity against the manufacturer if compelled to pay damages to a consumer because of the unwholesomeness of the food product, and the retailer "can avoid placing himself in a position wherein he could not, in turn, sue the manufacturer by electing to purchase only from responsible manufacturers within the jurisdiction of the courts in which he might enter suit." 45 So.2d at p. 673.
Assuming for the purpose of this argument that the reducing pills, being for human consumption, would fall within the same category as foodstuffs, insofar as the retailer's liability upon an implied warranty is concerned, the question then becomes: Does public policy dictate that the retailer be held to the same liability for the merchantability and fitness of the container of food products as is imposed upon him for the food products themselves? We confess that we can see no more reason for holding the retailer liable for a defect in a container of foodstuffs (when such defect is unrelated to and has no deleterious effect upon the food product itself) than for a defect in or the non-merchantability of the container of other non-food products which he sells at retail. The public interest in having a non-defective, merchantable container would seem to be the same, regardless of whether it encloses a food product or any other product.
In the Canada Dry v. Shaw case here relied upon by petitioner, 118 So.2d 840, the District Court of Appeal, Second District, quoted from Tennebaum v. Pendergast (Ohio Com.Pl.) 89 N.E.2d 490, in which a bottler was held liable for injuries caused by a bottle of Royal Crown Cola exploding in the consumer's hand. The appellate court also relied upon the decision of this court in Florida Coca-Cola Bottling Co. v. Jordan, supra, 62 So.2d 910  another suit against a bottler of the beverage for injuries caused by the consumer's swallowing broken glass which was contained in the *229 bottle. It is obvious that the bottler is in a position equivalent to that of a manufacturer of a product; and our holding in the Florida Coca-Cola Bottling Co. case is in accord with the modern trend of authority in this Country. See the cases collected in the annotation in 81 A.L.R.2d 226 et seq., on the subject, "Liability of manufacturer or seller of product sold in container or package for injury caused by container and packaging." It is interesting to note that only one case was cited by the annotator in which it was held that the retail-seller's implied warranty of fitness of a food product applied, also, to the container of such product, in the absence of statute  and that was the Canada Dry decision of our Florida appellate court here in question, supra, 118 So.2d 840. See 81 A.L.R.2d at page 258.
We are not persuaded that considerations of public policy require us to extend to food containers the "implied warranty" liability of retailers as to the food contained therein; on the contrary, we are of the opinion that it would be unreasonably burdensome to extend liability in this respect. A similar conclusion was reached by the Illinois appellate court in Crandall v. Stop & Shop, 288 Ill. App. 543, 6 N.E.2d 685, and by the federal court (applying Minnesota law) in Torpry v. Red Owl Stores, Inc., 1958, 8 Cir., 228 F.2d 117.
Accordingly, the Third District Court of Appeal was eminently correct in affirming the judgment of the trial court in the instant case insofar as it could be construed as holding that the complaint failed to state a cause of action, upon the theory of breach of implied warranty, against the defendant retailer, Weaver Drugs, Inc. This being so, it is unnecessary to decide whether the plaintiff-wife's suit would have been barred, had a cause of action existed, because of her lack of privity with the defendant, Weaver Drugs, Inc.
Our examination of the record in this cause reflected prima facie jurisdiction because of the alleged conflict with the decision of another district court of appeal, in Canada Dry Bottling Co. of Florida v. Shaw, supra, 118 So.2d 840. For the reasons stated, the decision of the appellate court in the Canada Dry case is disapproved, that of the appellate court in the instant case is approved, so the decision under review will not be disturbed and the writ is discharged.
It is so ordered.
DREW, C.J., concurs specially with Opinion.
CALDWELL and ERVIN, JJ., concur.
THORNAL, J., dissents with Opinion.
THOMAS and O'CONNELL, JJ., dissent and agree with THORNAL, J.
DREW, Chief Justice (concurring specially).
If we were to hold the decisions of the District Court without opinion were sacrosanct and beyond the power of this Court to review, it seems to me that in fairness to the Bench and Bar of this State and in the interest of the prompt and efficient administration of justice, the purpose could be most admirably served by the adoption of a rule of procedure by this Court that no such decision of a District Court would be subject to review on the theory of conflict certiorari. That would end the matter. I don't believe that my colleagues who have dissented from the main opinion would be agreeable to that course of action; nor would I.
Many problems have arisen in the interpretation of amended Article V. But there has been no dispute that under the constitutional plan for the administration of justice at the appellate level in this State the responsibility was placed in this Court to keep the law harmonious and uniform. *230 The language used by Mr. Justice Thomas in Lake v. Lake best expresses the view concurred in by all, viz.:
"Reverting now to the provision relevant to the present petition we say that it, too, is in the category. To remain stable, the law administered by the Supreme Court and the district courts of appeal must be harmonious and uniform. Were there not a central authority to keep it so it could happen that a district court of appeal would decide a given question of law one way and another district court of appeal another way, or one of them contrary to a former decision of the Supreme Court, through oversight or inadvertence, resulting in obvious confusion. To forestall any uncertainty that might derive from such situations, however infrequent, the provision was included in the amendment."
The controversy revolves around the question of what, in the constitutional sense, constitutes a decision. In the above quoted language we referred to "a given question of law." Webster's International Dictionary defines a decision as "a settling or terminating as of a controversy by giving a judgment on the matter; also a conclusion arrived at after consideration." We must assume, in the absence of something in the record to indicate a contrary view, that an affirmance of a decision of a trial court by a decision of the District Court of Appeal makes the trial court decision the decision of the District Court. So far as the trial judge is concerned and so far as the Bench and Bar who are familiar with the decision of the trial judge are concerned, such judgment is the law of that jurisdiction. I think it would result in utter chaos in the judicial system of this State with three separate District Courts, and the possibility of a fourth in the near future, if it were impossible for this Court to maintain consistency and uniformity of the law in such cases. A different rule of law could prevail in every appellate district without the possibility of correction. The history of similar courts in this country leads to the conclusion that some of such courts have proven unsatisfactory simply because of the impossibility of maintaining uniformity in the decisional law of such state. Our constitutional duty compels us, I think, to retain the power to, at least as far as possible, prevent this. Concededly the likelihood is not strong but, as was pointed out in the above quotation from Lake v. Lake "to forestall any uncertainty that might derive from such situations, however infrequent, the provision was included in the amendment."
I am entirely in agreement with the thought expressed that these courts must be courts of final appellate jurisdiction except in those instances mentioned in the Constitution. I think it is essential that we preserve such concept. A short review of some statistics since the organization of these courts will convince the most skeptical that they have in fact been courts of final appellate jurisdiction.
Through the year 1964, 14,444 cases were filed in the three District Courts of Appeal. During this same period of time 2005 petitions for certiorari to review such decisions were filed in this Court. Of the 2005 petitions for certiorari filed here, we granted certiorari in less than 30% of the cases. To put it another way, seven out of every ten petitions filed in this Court to review decisions of the District Courts over this period of time were denied without oral argument. In the 30% granted, the cause was set for argument [often on tile question of both jurisdiction and merits] and in better than two out of three cases, the decision of the District Court remained undisturbed. For example, in 1962, there were 276 petitions for certiorari filed, of which 77 were granted. In only 25 however was the decision of the District Court modified. In 1963, 294 petitions were filed, 90 were granted and in only 30 of these cases was the decision of the District Court changed or modified. To recapitulate, out of 2005 petitions for certiorari filed through 1964, the opinions of the District Courts were altered or changed in 180 cases, or *231 something less than 9% of those reviewed. Of the total cases filed in the District Court of Appeal, viz.: 14,444 nearly 99% remain undisturbed. This, it seems to me, is the most persuasive answer to the finality of decisions of the District Courts of Appeal. The foregoing statistics also constitute persuasive argument that the sole interest of this Court in the decisions of the District Courts is the performance of the constitutional mandate of the people to maintain harmonious and uniform decisions.
Another factor which influences me in my ultimate decision on this question is what is best for the judicial system of this State. The harm that could result in reserving in this Court the power to review such decisions under the conditions set forth in the main opinion is infinitely less than that which could result from the confusion and uncertainty in the decisional laws of this State were we not to do so. If I am to err  and none are free from that possibility  I prefer to err in the direction that will result in what I think will cause the least harm.
I do not share the view that this decision is going to bring about an avalanche of litigation in this Court or result in interminable delays in the ultimate disposition of cases. This has not been our experience in the past and all along it has been generally assumed that the judgment of the type we are discussing was subject to review in this Court by conflict certiorari. This conclusion is reached because during that period literally hundreds of such petitions have been filed in this Court. In the instances cited in the main opinion, they have been granted and conflicts have been reconciled. It is interesting to note [from a random examination of 50 cases] that the average time consumed from the date of the filing of petitions until the ultimate disposition of the cause was 89 days. This short delay in the ultimate disposition of these cases is indeed a small price to pay for consistency and uniformity of decisions through this State. Moreover, this Court will shortly consider and probably adopt an amendment to the present rules separating conflict certiorari into two stages. The first will determine jurisdiction and the second will determine the merits. This will speed up the process and should weed out many petitions that are quite obviously filed for the purpose of delay. If the Bar should disregard its primary obligations and the plain provisions of the Code of Ethics which govern them and use the procedures fixed by the law for the purposes of delay only, proper sanctions can and should be taken. I believe  at least I hope  such will not be necessary.
For these reasons, as well as those expressed in the majority opinion by Mr. Justice ROBERTS, I concur.
ROBERTS, J., concurs.
THORNAL, Justice (dissenting).
We are concerned with that aspect of our jurisdiction authorized in the following language of Article V, Section 4(2):
"The supreme court may review by certiorari any decision of a district court of appeal * * * that is in direct conflict with a decision * * * of the supreme court on the same point of law * * *." (Emphasis added.)
It becomes of consequence to ascertain why that provision was included. What were the conditions that suggested it? Why circumscribe the jurisdiction of the Supreme Court? What do we mean by "a decision on the same point of law?" How can one word "affirmed" be a "decision on the same point of law" in conflict with some other decision? If it can be, what "point of law" does the one word "affirmed" decide? These are questions which logically must be answered. These are questions which, in my humble view, are totally and completely eliminated from consideration by the majority.
The amendment of Article V was the best obtainable solution to the problems of an appellate judicial system that wallowed in *232 a quagmire of delay, expense, inefficiency and procedural inadequacy. Prior to the amendment a seventy year old system was provided to meet the requirements of one of the fastest growing states in the Union. The 1885 horse-drawn wagon just couldn't carry the 1955 cargo. The Supreme Court of Florida was receiving and disposing of about four times the number of cases handled by the average of the then forty-eight states. A division of three judges was hearing oral arguments at the rate of six cases a day. One-third of our cases, for example, came from Dade County. Litigants there were penalized by the expense of the long trip to Tallahassee and the lawyer's time out of his office, in addition to the expense of delay resulting from interest on judgments and inability to receive payment pending appeal. In criminal cases the bootlegger and bolita peddler usually enjoyed an additional two years of liberty merely through the expedient of an appeal and a supersedeas bond. By the same token oftentimes men remained in jail for months before we could hear their grievance and finally release them because of substantial errors in their trial and conviction. Perhaps Charles Dickens in his Bleak House description of the "Court of Chancery", rather adequately pictured the unfortunate predicament of the Supreme Court of Florida before Article V was amended, when he described a court:
"* * * which has its decaying houses and its blighted lands in every shire, which has its worn-out lunatic in every madhouse and its dead in every churchyard, which has its ruined suitor, with his slipshod heels and threadbare dress, borrowing and begging through the round of every man's acquaintance; which gives to monied might the means abundantly of wearying out the right; which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart that there is not an honourable man among its practitioners who would not give  who does not often give  warning, `Suffer any wrong that can be done you rather than come here.")
See Holdsworth, Charles Dickens as a Legal Historian, 1 (1929).
So it was that the people of Florida "gave justice a green light", (Florida Bar Journal, Dec. 1956), when they established the Courts of Appeal and restricted the jurisdiction of the Supreme Court by an overwhelming vote at the ballot box. Mr. Allen Morris, member of the Judicial Council and well-known political commentator, proclaimed it to be the greatest percentage of approval ever given to a controversial change in the State Constitution. Florida Bar Journal, Dec. 1956, p. 562.
Lest some suspect that there was something surreptitious or suppressed about the true meaning of the proposal let us look to the history of the times and the observations then given currency by formidable molders of public opinion.
Mr. John Pennekamp, associate editor of the Miami Herald, wrote with prophetic vision:
"The District Courts of Appeal could, with the cooperation of litigant-conscious lawyers, acquire an acceptance in most matters that would about equal that of the Supreme Court. They could provide an early `end of the road' for much litigation. Such has been the experience elsewhere.
"If, however, with this remedy at hand, the Supreme Court permits itself to continue to be involved in the wallow of too-much-to-do, it will endanger that prospect. The onus will be upon it, and again the Bar must accept public criticism.

"My principal fear is that wealthy litigants will use the intermediate court for delaying tactics designed to enforce compromises. This could be especially true in personal injury cases. The Supreme Court must establish itself, by stern conduct in receiving appeals, *233 as the steadfast opponent of such practice 1." (Emphasis added.) Florida Bar Journal, March 1956, p. 136.
Mr. Marion T. Gaines, Member of the Judicial Council and editor of the Pensacola News Journal, wrote:

"These district courts are not intermediary courts. They have final appellate jurisdiction in most cases. Cases of major importance would go directly to the Supreme Court. Thus the new courts do not present a means for a second appeal, but can help keep dockets current." (Emphasis added.) Florida Bar Journal, March 1956, p. 142.
Mr. James A. Clendinen, associate editor of the Tampa Tribune observed:
"This amendment should correct what I believe to be the worst of three major deficiencies in the present system: the suffocation of the Supreme Court under a mass of trivial appeals." (Emphasis added.) Florida Bar Journal, March 1956, p. 157.
I cite the foregoing views only as illustrative of the sentiment that motivated the amendment of Article V and the interpretation which the people received before they endorsed it with a resounding stamp of approval.
It appears to me that we now proceed to undo all of this. In our apparent anxiety to emphasize the word "Supreme" we can easily overlook the fact that the Courts of Appeal are "supreme" in certain areas. This is so because the people themselves have said so. They have withdrawn from us certain powers while endowing us with certain new powers to be exercised in a more restricted orbit. Before we execute the undoing let us look to our own pronouncements. Let us be prepared to erase nearly eight years of development in the jurisprudence of our state in which we ourselves have furnished the lead. If the majority is correct I think we should take these prior decisions one by one and explain them away or else recede from them. Let us not pilot the Bar of this state into the narrows of a legalistic Messina between a judicial Scylla and Charybdis. The metaphor is not intended as an offense to my brethren of the appellate bench. Nonetheless, it appears to me that safe passage past one should usually be sufficient, without an insistence that inspection by two is required. Actually, the impact of the majority decision is to create a multiple-leveled appellate system with all of its attendant expense and delay.
It should be recalled that we are dealing with that provision of our Constitution which authorizes this Court to review by certiorari "any decision of a district court of appeal that is in direct conflict with a decision" of the Supreme Court "on the same point of law * * *." Let us not forget the proposition that we here deal with judicial power to act. If the Supreme Court has the power to act in the instant case we must find it imbedded in the language of the Constitution.
It appears to be the view of the majority that the one word "affirmed" can constitute a "decision" of such nature that it can also "conflict" with a prior decision of this Court "on the same point of law." The majority concedes that in order to produce an apparent conflict we must pierce the judgment of the Court of Appeal, scrutinize the pleadings, analyze the orders on the pleadings and then formulate our own conclusion as to the reason why the Court of Appeal pronounced the one word "affirmed." The position taken by the majority appears to contradict itself and refute the validity of its own contentions. I gain this viewpoint from the fact that the majority seems to hold that this Court can endow itself with the privilege of plowing the record back to the complaint in order to detect what it conceives to be a conflict. With some degree of restraint the majority confesses that it cannot and should not examine the testimony. With all due respect for the ability and experience of my *234 brethren I find it utterly impossible to locate anything in the Constitution that conveys to this Court the privilege of exploring trial records in order to produce a conflict of decision. At the same time, however, if this Court has the power to examine bills of complaint and disagree with trial judges on motions to dismiss and rulings on the pleadings when a District Court affirms without an opinion on the subject, I see no reason at all why this Court does not similarly enjoy the privilege of examining the transcript of testimony. If we can explore the trial record as contended by the majority then why can we not extract factual conclusions therefrom in order to generate a conflict of decisions out of the one word "affirmed." If we cannot examine the testimony, and the majority concedes this, then how can we legitimately and logically examine the remainder of the record behind the opinion? In the administration of justice it appears to me to be equally vital that a court restrain itself against usurpation of power or against the exercise of power which it does not have, as it is to be alert to exercise courageously the power which it does have.
The majority holds that we have the power to examine trial records to create a conflict of decision when a District Court affirms without opinion. If we have this power, and I insist that we do not, but if we do, then when a District Court affirms with a full opinion the same source of power would logically lead the majority to check all of the records back of the opinion to determine whether, in its view, the District Court has overlooked something.
All of this simply means that the District Court decisions are no longer final under any circumstances. It appears to me that the majority view is an open invitation to every litigant who loses in the District Court, to come on up to the Supreme Court and be granted a second appeal  the very thing that many feared would happen  and the very thing which we assured the people of this state would not happen when the judiciary article was amended in 1956.
But, says the majority if there is too much of this repetitive appealing there will be ways to deal with it. I just do not know any way to deny to litigants the chance to have a second review where the majority of this Court so clearly invites it. If I were a practicing lawyer in Florida, I would never again accept with finality a decision of a District Court. Under the majority decision today, there is always that potential opportunity to obtain another examination of the record by the Supreme Court with the hope that it will in some way differ with the District Court.
Statistics do suggest that a relatively small percentage of District Court decisions have been brought to the Supreme Court for review. It is true also that only a minute percentage of these decisions have been disturbed by us. Obviously, this results from two factors: (1) the judicial restraint which this Court has heretofore exercised in refusing to extend its jurisdiction beyond constitutional limits, and (2) the excellent judicial competence of the District Courts themselves. There simply hasn't been any reason to disturb their decisions to any substantial degree.
However, with the "two appeal" opportunity now made available by my fine colleagues of the majority, it is perfectly clear that every one of the 2,500 or more cases disposed of by the District Courts this year will be a ripe subject for a second review by the Supreme Court. Add these to the nearly 900 which we ourselves can logically expect, and one can readily see what is in the offing for Florida's appellate court system. The worst fears of the editors whom we quoted at the outset, will then have come to pass.
When we recall that the delays, expense and inadequacy of our former system germinated in the inordinate number of cases reaching this Court; when we recall the *235 assurances that were given that we would not compound the evil by constructing a multiple appellate system allowing repetitive appeals; it seems to me that we should exercise extreme caution against reaching out beyond the confines of the Constitution to endow ourselves with jurisdiction which we do not have.
With profound respect for the views of my colleagues, I nonetheless earnestly dissent.
THOMAS and O'CONNELL, JJ., concur.
NOTES
[1] "§ 3. Practice and Procedure  The practice and procedure in all courts shall be governed by rules adopted by the supreme court."