177 So.2d 672 (1965)
James Allen STILES, Jr., and Eulalia Stiles Boone, as Executors of the Estate of James Allen Stiles, Sr., Eulalia Stiles Boone, individually, James Allen Stiles, Jr., Individually, and Voncille Stiles, individually, Appellants,
v.
John BROWN, as Tax Assessor of Leon County, Florida, W.K. Collins, as Tax Collector of Leon County, Florida, and Ray E. Green, as Comptroller of the State of Florida, Appellees.
No. G-197.
District Court of Appeal of Florida. First District.
August 5, 1965.
*673 Ausley, Ausley, McMullen, O'Bryan, Michaels & McGehee, Talahassee, for appellants.
Leo L. Foster and J. Klein Wigginton, of Parker, Foster & Madigan, Tallahassee, for appellees.
RAWLS, Chief Judge.
Appellants bring this appeal from a final decree dismissing their complaint by which they sought to question the validity of the 1964 assessment of certain lands lying in Leon County. They contend that it was the mandatory duty of the tax assessor to assess the subject lands as agricultural lands upon an acreage basis as provided for in Section 193.11(3), Florida Statutes, F.S.A., and his failure to do so renders the contested assessment void ab initio. The tax assessor contends that appellants, having failed to exhaust their administrative remedies, cannot now contest the validity of said assessment.
The issues are sharply drawn. Appellants alleged that on the 1st day of January 1964, and for at least the last prior five years the lands were being used for bona fide agricultural purposes and that the tax assessor "obviously" ignored the clear provisions of Section 193.11(3), Florida Statutes, F.S.A., and assessed same other than as agricultural lands. They then decided that the subject lands should have been assessed at the sum of $9,637.24 and tendered into the registry of the court what they determined to be the taxes due in the sum of $528.24. What appellants failed to allege is important, viz.: (1) That the assessment of $576,390.00 did not exceed the market value as of the critical date of assessment; (2) that they returned the lands for taxation, and (3) that they appeared before the Board of Equalization or otherwise pursued their administrative remedies.
The chancellor in his final decree found that the value of the land for agricultural purposes did not exceed $32,909.00, and the assessment of $576,390.00 exceeded the fair market value of said land since appellants failed to allege the contrary. After noting portions of other applicable statutes, viz.: Section 193.12 which provides in part:
"* * * the assessment and valuation made by the assessing officer or officers shall be deemed and held to be binding upon such owner * * * unless complaint is made of such assessment and valuation on the day set for hearing complaints and receiving testimony as to the value of any property, real or personal, as fixed by the county assessor of taxes."
and Section 193.25 requires the Board of Equalization to sit:
"* * * for the purpose of hearing complaints and receiving testimony as to the value of any property, real or personal, as fixed by the county assessor of taxes * * *."
the chancellor concluded that plaintiffs could not now be heard in a court of equity to complain about the instant assessments.
We quote with approval the following excerpts from the final decree:
"It is sufficient to say that in some factual situations a court of equity has been held to have power to grant relief even though no return was filed and no complaint made to the Board of Equalizers.
* * * * * *
"The plaintiffs did not make a tax return disclosing the use to which their property was being put and thereby point out to the Tax Assessor that this *674 property was subject to a 94% tax exemption under Section 193.11(3).
"They did not inform the Board of Equalizers of the facts upon which they now claim this exemption.
"No fraud is charged. From the facts alleged, the Court must assume that the Tax Assessor knew the actual value of the land but did not know of the fact that it was being used as pasture lands and was not, therefore, subject to taxation at its real value.
"The court does not hesitate to hold that a property owner demanding the extremely favorable consideration offered by Section 193.11(3) must, during the assessing process, furnish to the proper administrative officers the facts upon which he bases this claim. Failure to do so brings him clearly within the express language of Section 193.12. No circumstances are shown which appeal to a court of equity as sufficient to justify refusal to follow the letter of this statute.
"There is another reason why the plaintiffs should be held to the rule requiring exhaustion of administrative remedies before seeking judicial relief.
"It is the basic plan of the taxing statutes that enough, but only enough, money be raised by taxation to meet the needs of the public treasury, and that the tax burden be apportioned among the property owners in the most equitable manner possible.
"To that end the statutes require a very orderly procedure for the ascertainment of the tax obligation of each property owner as follows:
"1. The County Tax Assessor assesses each item of property subject to ad valorem taxation.
"2. The Board of Equalization sits to review these assessments, correct mistakes and afford each property owner an opportunity to point out errors.
"3. The County Commissioners prepare a county budget, taking into consideration all other sources of income, and arrive at the amount of money which must be raised by ad valorem taxation.
"4. With the aggregate assessed value of all taxable property determined and the amount of money to be raised by ad valorem taxation ascertained, it is a simple mathematical computation to fix the rate of taxation  the millage  necessary to balance the county budget.
"5. The Tax Assessor extends the taxes and turns the books over to the Collector who receives the taxes as they are paid.
"The taxpayer has the right to expect public officials to do their duty, but he owes a duty to himself and to the public to cooperate in the processes by which his tax burden is determined. He should file a tax return. But failure to file a return does not preclude his appearing before the Board of Equalizers to protest an excessive assessment.
"If a taxpayer owns property with respect to which he is entitled to preferential treatment because of the use to which the property is put, it is only reasonable to require that he either return the property for taxation and provide the assessor with the information necessary to a proper assessment, or, failing in this, that he present the facts to the Board of Equalizers to the end that the proper assessment of his property be made before the rate of taxation is fixed in reliance upon the correctness of all assessments after equalization.
"This should apply particularly to a claim that the owner of property is entitled to be taxed on the basis of an *675 assessment which is less than 6% of its actual value merely because it is presently being used for a purpose other than its highest and best use.
"It is not unreasonable to require a taxpayer who seeks to secure the benefits of Section 193.11(3), Florida Statutes, to assert his claim before the county budget has been prepared and taxes levied on the basis of an erroneous assessment.
"If the plaintiffs are granted the relief sought, the county receipts from ad valorem taxes will be reduced by more than $9,000.00. If other taxpayers who are the unintentional victims of the assessor's errors can, at this late date, join plaintiffs in seeking a reduction of their taxes, every fund in the county budget may well be substantially reduced and the whole budget system impaired.
"As against this, if property owners are required to exercise vigilence and to protest the over-assessment of their property before the tax levy has been made in reliance upon the validity of the assessment roll, no great hardship is imposed upon them, and proper tax levies can be made to keep the public business operating upon a balanced budget.
"Every element of equitable estoppel is present. The plaintiff failed to return their property for taxation and disclose its use and their claim to partial tax exemption. They failed to inform the Board of Equalization of their claims when they were charged by law with knowledge and informed by legal advertisement of the exact date that the Board of Equalization would meet to hear complaints. They sat idly by knowing that taxes would be levied based upon the assessments made by the County Tax Assessor, and knowing that any substantial reduction in the assessed value of taxable property made after the millage had been set would cause a proportionate reduction in the funds available from ad valorem taxes to meet the budgeted expenses of the county.
"By waiting until after the millage had been fixed, taxes extended the books delivered to the Tax Collector and taxes actually paid by many property owners, they made it impossible for the county officials to adjust the tax rate to conform to the new assessed value so as to produce the funds necessary to carry on the county government."
We are not unmindful of the three decisions of our Supreme Court which were contemporaneously filed on May 21, 1965.[1] As we construe the Walter case, it holds that "just valuation" as provided for in the Constitution is equivalent to "x" and that "x" is established by the classic formula which is, the amount "a purchaser willing to but not obliged to buy, would pay to one willing but not obliged to sell." This decision standing alone would afford a clear path to follow. However, the Lanier case, as we construe it, holds that "just valuation" as applied to agricultural lands must be predicated upon an agricultural use and does not impel a consideration of "potential" use which is not "expected immediately" although such more valuable use may be anticipated "even during the current tax year," and that "* * * [i]f and when he [the taxpayer] puts his agricultural land on the market for sale for a `higher and better' use  or, at least, one more valuable than an agricultural use  the property would no doubt no longer qualify as one `being used' for the agricultural purposes * * *" In the Markham case, the court approved an interpretation by the chancellor which in effect held that *676 "just valuation" as provided for in the constitution, when construed in conjunction with pertinent statutory provisions, means "the present agricultural cash value" and that the tax assessor must assess agricultural lands at only their value for agricultural use, and must take no other factors into consideration. So, in the Walter case, our Supreme Court holds that "just value", "fair market value", "true cash value", "real value," and "assessed value" as used in the constitution, statutes, and decisions, mean the real worth, that valuations less than 100% "x" cannot be tolerated, and that assessments at more or less than 100% "x" would not accomplish "just valuation". But in the other two cases the "just value" of agricultural lands for assessment purposes hinges upon the use of the land, not upon "fair market value" as defined in the Walter case, and "just value" and "fair market value" are not synonymous when applied to lands being utilized for bona fide agricultural purposes. As we interpret the three decisions, lands not being used for bona fide agricultural purposes must be assessed at fair market value without regard to their present use, but that agricultural lands must be assessed upon the basis of what somebody will pay for them for the purpose of raising timber, citrus, cattle, or for other farming operations. As noted in the case sub judice, it makes a difference.
After analysing the aforementioned cases, we are of the opinion that the chancellor was correct in placing upon the property owner the responsibility to protest to the Board of Equalization the failure of the tax assessor to give him the benefit of Section 193.11(3), Florida Statutes, F.S.A. The statute specifically provides that lands being used for "* * * bona fide farming, pasture, grove, or forestry operation * * *" are eligible for special treatment for taxation purposes. As we construe this portion of the statute, the intent of the property owner, of necessity, must be ascertained as to the utilization of his land. For instance, one of two abutting property owners, each having three thousand acres of timberland, may conduct a bona fide timber program while the other primarily utilizes his land as a game preserve with timber producing being incidental. A visual examination of the property by the tax assessor would disclose a similar utilization of the lands, but the bona fides of the utilization of each tract for agricultural purposes would depend to some extent upon the subjective thinking of the landowner. Or consider the obvious illustration of a speculative subdivision developer who places a few cows on urban land and calls it a ranch. Thus, it is the bona fides of the utilization by the landowner that makes the land eligible for the benefits of the statute, and the physical condition and appearance of the subject property is not of itself controlling. To require the tax assessor to interrogate each owner of land and determine whether or not he is utilizing the taxable land for bona fide agricultural purposes as defined by said statute would impose an intolerable burden upon this official and local government. We do not think that the subject statute, nor the Lanier and Markham cases contemplated imposing such a burden upon the tax assessor, and will not read into the statute or the cases such construction.
Nor do we overlook the prior Lanier decision. There the chancellor held that the tax assessor was under a duty to assess agricultural lands on the basis of the highest and best agricultural use on an acreage basis and failure to do so was an unlawful assessment. The second district reversed,[2] holding in effect that although Section 193.11 required an assessment of agricultural lands on an acreage basis, the failure of the tax assessor to assess agricultural lands with reference to "full cash value" as lands to be used for agricultural purposes was not error. In reversing the appellate court, the Supreme Court[3] held that agricultural lands constituted a constitutional *677 classification of real property for taxation purposes and the concept of "just valuation", "full cash value", "uniform and equal rate of taxation" when read in connection with the requirements of § 193.11(3), Florida Statutes, F.S.A., may be readily harmonized. It does not appear that the issue with which we are here concerned was raised in any of these cases, i.e.: "Is an assessment of agricultural lands void ab initio for the failure of the tax assessor to ascertain such classification when making the assessment?" We think not.
Furthermore, we are aware of that line of cases setting forth the rule of law relied upon by appellant. This rule is most concisely stated in Graham v. City of West Tampa,[4] to wit:
"Where the essential requirements of law are not observed in making valuations of property for assessment, and the valuations as made are shown by admissions or proofs to be clearly excessive, unjust, and unequal, appropriate relief may be had in equity, even though the proceedings authorized by law for seeking relief from administrative officers were not utilized, where the case made shows a flagrant violation of or omission to follow the mandatory requirements of the law in valuing property for taxation." (Emphasis supplied.)
The reverse of the rule is set forth in City of Tampa v. Palmer,[5] which holds that a taxpayer who has not exhausted his administrative remedies will not be granted relief in a court of equity against an excessive valuation, when such excessive valuation is due solely to error in judgment, inadvertence or mistake and when unaffected by either illegality in point of law, actual fraud, or conduct on the part of the tax assessor which in law would amount to a fraud upon or unlawful discrimination against the taxpayer. This case also held that though it is the duty of a taxpayer to make due return of his property for taxation, failure to do so would not, of itself, work an estoppel against him. However, none of these cases involve the agricultural lands assessment statute. When the District Court, Third District, was confronted with an excessive assessment on agricultural lands in Matheson v. Elcook[6] it held:
"So long as all of this land was used in good faith for agricultural purposes, then the land had to be assessed as provided by § 193.11(3) * * * but we hasten to point out that before the taxpayer can take advantage of this statute he must demonstrate to the taxing authorities that his agricultural operation is bona fide, in good faith." (Emphasis supplied.)
We hold that it is the duty of a landowner desiring the beneficial treatment of Section 193.11(3) to make known to the taxing authorities his claim of utilizing the subject property for agricultural purposes, either by making a timely return of his property or by exhausting his administrative remedies and that in the absence of a landowner so doing, an assessment which does not give effect to said statute, is valid.
Obviously, the import of this decision is of great public interest in that it could affect the revenues of each of the sixty-seven counties of this state. In order to assure that a uniform and harmonious decision applicable throughout the state is *678 operative, we determine and certify that the decision rendered herein is one which passes upon a question of great public interest as contemplated by Section 4(2), Article V, Constitution of Florida, F.S.A.
Affirmed.
CARROLL, DONALD K., J., and SMITH, SAMUEL S., Associate Judge, concur.
NOTES
[1] Walter v. Schuler, (Fla. 1965), 176 So.2d 81, opinion filed May 21, 1965; Lanier v. Overstreet, (Fla. 1965), 175 So.2d 521, opinion filed May 21, 1965; and Markham v. Blount, (Fla. 1965), 175 So.2d 526 opinion filed May 21, 1965.
[2] Lanier v. Tyson, 147 So.2d 365 (Fla.App. 2d, 1962).
[3] Tyson v. Lanier, 156 So.2d 833 (Fla. 1963).
[4] Graham v. City of West Tampa, 71 Fla. 605, 71 So. 926, 928 (1916); Camp Phosphate Co. v. Allen, 77 Fla. 341, 81 So. 503 (1919); § 196.01, F.S.A. and cases cited therein; and West Virginia Hotel Corp. v. Foster Co., 101 Fla. 1147, 132 So. 842 (1931) which held that an assessment of twice the actual value of the property was so excessive as to amount in law to a fraud.
[5] City of Tampa v. Palmer, 89 Fla. 514, 105 So. 115 (1925); Also German-American Lumber Co. v. Barbee, 59 Fla. 493, 52 So. 292 (1910).
[6] Matheson v. Elcook, 173 So.2d 164 (Fla. App.3d, 1965).