235 So.2d 300 (1970)
R.R. (Bob) WALDEN, As Tax Assessor of Hillsborough County, Florida, Petitioner,
v.
The BORDEN COMPANY, a Corporation, et al., Respondents.
No. 38664.
Supreme Court of Florida.
May 6, 1970.
Rehearing Denied June 11, 1970.
William Terrell Hodges, of Macfarlane, Ferguson, Allison & Kelly, Tampa, for petitioner.
C. Lawrence Stagg, of Holland & Knight, Tampa, for respondents.
ROBERTS, Justice.
This cause is before the court on direct conflict certiorari to review the decision of the District Court of Appeal, Second District, in Walden v. Borden Company, Fla. App. 1969, 221 So.2d 771, affirming without opinion the trial court's summary judgment under the authority of Matheson v. Elcock, Fla.App. 1965, 173 So.2d 164, cert. disch., 184 So.2d 889. We have examined the record proper, see Foley v. Weaver Drugs, Inc., Fla. 1965, 177 So.2d 221, and have concluded that the trial court's judgment was improper under the well settled rule respecting the propriety of a summary judgment where there is a genuine issue of material fact. See Holl v. Talcott, Fla. 1966, 191 So.2d 40 and cases cited. The decision affirming such judgment is, therefore, in direct conflict with Holl and similar cases.
The trial court's summary judgment was entered in a suit filed by the respondent, The Borden Company, challenging the validity of a 1967 tax assessment against a 3,800-acre tract of land owned by it in Hillsborough County adjacent to its phosphate mining operations in that area. The tax assessor had classified the tract as non-agricultural and valued it on that basis. *301 The Board of Equalization concurred. The trial judge disagreed and entered summary judgment invalidating the assessment.
The summary judgment was based on affidavits of the manager of the company's local phosphate mining operations and the current lessees of the tract. The manager stated that he had been with the local operating company since 1932, and, to his knowledge, the property had since that date been used "for pasture and/or farming purposes and no other." The lessees stated that they had taken over the lease of a former lessee and his 225 head of cattle in December of 1966 and that prior to, and on January 1, 1967, the property was "native pasture land which was used solely for cattle grazing." The lease was apparently a form lease providing for a tenancy at will terminable on 60 days' notice, and for a rental of 50 cents an acre on 3,750 acres and $10.00 an acre on the remaining 50 acres. It contained clauses by which Borden reserved an easement upon the property for the discharge of smoke fumes and other by-products which arise out of its phosphate production and by which the lessees released Borden of any claims for damages arising out of the discharge of such waste products. Borden states in its brief that "[t]hese are simply standard provisions required by Borden as partial consideration for its lease, to protect itself against claims which might arise by reason of operations conducted on neighboring property" and that they "in no way affect the possession and occupancy of the Tenants, nor change the undisputed use of the property for agricultural purposes." The record does not show whether the property has ever been used for the phosphate operations.
It is clear that the lessees were on January 1, 1967, using the property  or, at least, a portion of it  for a recognized "agricultural" purpose, the pasturing of cattle. The Borden Company takes the position that their lessees' use of the property for an agricultural purpose determines the character of the land for tax purposes, and that any potential use of the property by the company in connection with the adjoining phosphate operations is simply irrelevant. The tax assessor argues that the lessees' agricultural use is only "servient, temporal and incidental" to the primary and dominant use of the property by the owner for non-agricultural purposes and that the company could not, therefore, claim a right to the preferential tax treatment accorded to "bona fide" agricultural lands by the statute. Our examination of the history of the applicable statutes persuades us of the soundness of the assessor's position.
As pointed out by James S. Wershow in his article on "Recent Developments in Ad Valorem Taxation," 20 Fla.Law Review 1 et seq. (Summer 1967), our first tax statute relating specifically to agricultural lands (Ch. 57-195, Acts of 1957, carried forward as Section 193.11(3), Florida Statutes, F.S.A., and transferred to Section 193.071(3), Fla. Stat. 1969, F.S.A.) was enacted to sweep away remnants of the 1925 boom subdivisions in Dade County. It directed the tax assessor to assess agricultural lands upon an acreage basis "regardless of the fact that any or all of the lands were embraced in the plot of a subdivision or other real estate development." Only incidentally was the term "agricultural purposes" defined. A true "green belt" statute (Ch. 59-226, Acts of 1959, carried forward as Section 193.201, Florida Statutes, F.S.A.) giving tax protection to agricultural lands, was adopted in 1959. Its provisions for zoning lands as agricultural or non-agricultural were, however, optional and could be rejected or accepted by the board of county commissioners in its discretion. (Cf. Section 193.201 as amended by Ch. 67-117, Acts of 1967, carried forward as Section 193.461, Fla. Stat. 1969, F.S.A.) providing for the mandatory zoning of lands as agricultural or non-agricultural by an agricultural zoning board  composed of the county tax assessor and others  and see Chapter 67-593, Acts of 1967, withdrawing from the county tax assessor the right to make this determination alone by "suspending" *302 the operation of Section 193.11(3), supra, so long as Ch. 67-117, supra, remains in effect.
In any event, Section 193.11(3), supra, was soon interpreted as setting up a special tax classification for agricultural lands, see Tyson v. Lanier, Fla. 1963, 156 So.2d 833; and its constitutionality was upheld in Lanier v. Overstreet, Fla. 1965, 175 So.2d 521, as against a contention that it provided an uconstitutional partial exemption of agricultural lands from taxation. In that case we said that
"* * * no preferential treatment has been accorded the agriculturist who desires to retain his property as such as against the encroachment of an expanding urban community. If and when he puts his agricultural land on the market for sale for a `higher and better" use  or, at least, one more valuable than agricultural use  the property would no doubt no longer qualify as one `being used' for the agricultural purposes named in the statute and thus not within the intendment thereof."
We could have pointed out, also, that even though the use of property for agricultural purposes instead of a housing development or shopping center reduces the revenue available for county or city purposes, at the same time it makes unnecessary the expenditure of public funds to provide the additional public services required by such improvements; and with our growing awareness of the necessity to diversify, for ecological reasons, our business economy and land use, the reasonableness of such a use classification of property for tax purposes is even more apparent today than it was five years ago.
The decision in Lanier upholding the validity of the statute, Section 193.11(3), was followed by many others that were concerned with the problems encountered by the tax assessors in evaluating agricultural lands. See Powell v. Kelly, Fla. 1969, 223 So.2d 305, discussing in some detail these decisions. In none of them, however, was it held that the taxpayer-landowner was entitled to an agricultural classification by virtue of a lessee's use of the land if the land was, at the same time, serving another use or purpose of the landowner. Cf. Stiles v. Brown, Fla.App. 1965, 177 So.2d 672, indicating that a dual use of the land by the owner would defeat the classification of the land as agricultural. Matheson v. Elcock, Fla.App. 1965, 173 So.2d 164, relied upon by the appellate court in support of its decision of affirmance in the case sub judice, is authority only for the proposition that the owner's bona fide use of all of his property exclusively for agricultural purposes for a great many years entitled him to the benefit of Section 193.11(3), despite the fact that the value of his land for urban development purposes was greatly disproportionate to its value as agricultural land. It does not answer the question presented by the facts of this case, as revealed by the record and affidavits.
We have concluded that the legislative classification of agricultural lands for tax purposes was intended to benefit the owner whose lands are dedicated to the named agricultural purposes "exclusively" so used under old Section 193.201 and "primarily" so used under new Section 193.461 whether such use is being made directly by the owner himself or indirectly through an agent or lessee; and that the legislature did not intend to give preferential tax treatment to land such as that in the instant case that was obviously purchased for use in connection with the company's phosphate operations and is still being used for that purpose, even though it accommodates, also, an incidental use for agricultural purposes. Our conclusion would be the same were the agricultural operation being conducted by the company itself instead of a lessee.
Since, then, there was a genuine issue of fact as to whether or not the property in question was entitled to the agricultural classification, it was error to enter summary judgment in favor of Borden. Other issues made by the complaint were unresolved, *303 since the case turned on the question of classification.
For the reasons stated, the decision affirming the summary judgment is quashed and the cause remanded for further proceedings not inconsistent herewith.
It is so ordered.
ERVIN, C.J., DREW and CARLTON, JJ., and SCHULZ, Circuit Judge, concur.