**Mary GREEN and Edwin Green, Jr., Appellants,**

v.

**AMERICAN TOBACCO COMPANY, Appellee.**

**No. 22435.**

United States Court of Appeals Fifth Circuit.

Jan. 24, 1968.

Rehearing En Banc Granted March 25, 1968.

---

Lawrence V. Hastings, Irma Robbins Feder, Miami, Fla., for appellants.

A. Lee Bradford, Miami, Fla., Edward R. Neaher, New York City, for appellee.

Before PHILLIPS,[*] COLEMAN and

SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

This is an appeal from a jury verdict and judgment for the defendant in the second trial of a suit on implied warranty, grounded on a prior jury finding in the same case that plaintiff's decedent died of cancer and that smoking cigarettes was a cause thereof. For the second time, we reverse and remand for a new trial.

Nearly ten years ago, in December, 1957, Edwin Green, Sr. brought suit against the American Tobacco Company, claiming that he had incurred lung cancer as a result of smoking the defendant's product, Lucky Strike cigarettes.

About two months after filing the suit, on February 25, 1958, Mr. Green died. His administrator was substituted as plaintiff and his widow also filed suit under the Florida Wrongful Death Statute. On two theories of liability, breach of implied warranty and negligence, the cases after consolidation were tried to a jury, which returned general verdicts for the defendant. In answer, however, to certain interrogatories submitted under Rule 49(b), Federal Rules of Civil Procedure, 28 U.S.C.A., the jury in this first trial found that Mr. Green had primary cancer of the lung, that this was the cause or one of the causes of his death, and that smoking Lucky Strike cigarettes was a proximate cause or one of the proximate causes of the cancer.

Notwithstanding this finding, the verdict went to the defendant because, in response to another interrogatory, the jury further found that on or prior to February 1, 1956, the defendant Tobacco Company by the reasonable application of human skill and foresight could not have known that users of Lucky Strike cigarettes, such as Mr. Green, would thereby be put in danger of contracting lung cancer.

Of course, the plaintiffs appealed. On May 2, 1962, 5 Cir., 304 F.2d 70, a panel of this Court composed of Judges Rives, Cameron, and Griffin Bell[1] affirmed the judgment in favor of the cigarette manufacturer. In that opinion the result turned on the jury finding that there was no developed human skill or foresight which could have afforded the manufacturer a knowledge of the harmful effects. Judge Cameron dissented, quite cogently pointing out that even for breach of implied warranty the decision amounted to a holding that the exercise of reasonable care on the part of the Tobacco Company would exonerate it from liability.

On petition for rehearing, decided June 20, 1962, 304 F.2d at page 85, rehearing was granted to the extent of certifying to the Supreme Court of Florida[2] the following question:

"Does the law of Florida impose on a manufacturer and distributor of cigarettes absolute liability, as for breach of implied warranty, for death caused by using such cigarettes from 1924 or 1925 until February 1, 1956, the cancer having developed prior to February 1, 1956 and the death occurring February 25, 1958, when the defendant manufacturer and distributor could not on, or prior to, February 1, 1956, by the reasonable application of human skill and foresight, have known that users of such cigarettes would be endangered by the inhalation of the main

---

[*] Of the Tenth Circuit, sitting by designation.

[1.] Judge Rives has since retired from active service and Judge Cameron died April 2, 1964.

[2.] § 25.031, Florida Statutes, 1959, F.S.A. Supreme Court authorized to receive and answer certificates as to state law from federal appellate courts.

stream smoke from such cigarettes of contracting cancer of the lung?"

[154 S.2d at 170].

It is to be noted that the question begins "Does the law of Florida impose on a manufacturer and distributor of cigarettes *absolute liability, as for breach of implied warranty* [?]". It was nearly a year before the Supreme Court of Florida responded in a 5–2 decision [154 So.2d 169, June 5, 1963]. The Court concluded:

"That the question thus framed does not present for our consideration the issue of whether the cigarettes which caused a cancer in this particular instance were as a matter of law unmerchantable in Florida under the stated conditions, nor does it request a statement of the scope of warranty implied in the circumstance of this case. The inquiry before us is, instead, limited to the status of Florida law upon imposition of liability 'as for breach of implied warranty' *when the manufacturer or warrantor 'could not by the reasonable application of human skill and foresight, have known of the danger'."* [emphasis ours]

The Florida Supreme Court proceeded to state in clear and unmistakable language:

"That a manufacturer's or seller's actual knowledge or opportunity for knowledge of a defective or unwholesome condition is wholly irrelevant to his liability on the theory of implied warranty, and the question certified must therefore be answered in the affirmative. As already indicated, we do not feel that the inquiry in terms either requests a response on the ultimate issue of liability in this case or requires any comment on the disposition of issues between the court and the jury under the law relating to scope and breach of the implied warranty that a product supplied for human consumption shall be reasonably fit and wholesome for that general purpose."

The Court went on to say, however,

"The contention that the wholesomeness of a product should be determined *on any standard other than its actual safety for human consumption, when supplied for that purpose, * * * [is] one which we are persuaded has no foundation in the decided cases."* [Again emphasis ours].

Six months later, again with Judge Cameron dissenting, this Court held that it could not enter judgment for the plaintiffs on the issue of liability, 325 F.2d 673, for the reason that:

"The Florida Supreme Court's rule is only that a product must be 'reasonably fit and wholesome' and have a 'reasonable fitness for human use or consumption'."

With deference, we feel that this view overlooked the language italicized immediately above but the views of the prior panel would be binding upon us, of course, were it not for developments later to be discussed.

The Court of Appeals further pointed out that on the first trial of the case in the District Court the jury, at the request of the plaintiffs, had been charged that "The manufacturer of products which are offered for sale to the public in their original package for human consumption or use impliedly warrants that its products are reasonably wholesome or fit for the purpose for which they are sold * * *." The adverb "reasonably" to modify "wholesome or fit" had been inserted in the instruction at the consent of the plaintiffs. The original Panel then said, "As a part of the law of this case the parties are, therefore, bound by the scope of the implied warranty as so defined by the District Court".

This was followed by the crucial determination, 325 F.2d at page 677, that the jury had not made any sufficient finding on the question of reasonableness, that is, as to whether or not the cigarettes were "reasonably fit and wholesome" and therefore the defendant was not foreclosed from developing that issue on another trial.

We then directed:

"[T]he parties are nonetheless bound by the jury's answers to the written interrogatories [and] may not relitigate the issues thus already decided [that smoking Lucky Strike cigarettes was one of the causes of the cancer and that the cancer was one of the causes of the death] under the guise of presenting evidence on the issue of reasonableness, that is, as to whether the cigarettes were *reasonably* fit and wholesome."

Judge Cameron, concurring in part and dissenting in part, was of the view that the warranty "Was that the cigarettes purchased by [Green] would not do him harm" and that the plaintiffs should not be required to show "that the cigarettes were not reasonably fit and wholesome for use by the general public".

As far as we can tell, the parties made no further effort to obtain the direct, positive answer of the Supreme Court of Florida to that part of the original question which had propounded the inquiry, "Does the law of Florida impose on a manufacturer and distributor of cigarettes absolute liability, as for breach of implied warranty * * * [?]".

The plaintiffs might well have been encouraged to do so in view of the language which the Florida Court had added to the effect that *actual safety for human consumption was the standard for the determination of the wholesomeness of a product.*

The result of the foregoing was that the case went to a second jury trial in which, pursuant to the opinion of 325 F.2d 673 the sole issue (and any factor not inconsistent therewith) was whether the cigarettes used by Mr. Green were reasonably fit and wholesome for human use, the parties being expressly commanded not to attempt to relitigate the already established facts that Green died of lung cancer and that the cigarettes were a cause of that cancer.

The jury verdict again was for the Tobacco Company. The judgment thereon was dated November 27, 1964.

The date is significant for, thereafter, on May 5, 1965, in the case of McLeod v. W. S. Merrell Company, Division of Richardson-Merrell, Inc., 174 So.2d 736, the Supreme Court of Florida stated that Green v. American Tobacco Company, Fla., 154 So.2d 169, was:

"A suit against a manufacturer. It involved a commodity which was available indiscriminately to the public generally. *Green* can be summarized as a case which applied a rule of absolute or strict liability to the manufacturer of a commodity who had placed it in the channels of trade for consumption by the public generally".

## I.

We now come directly to the question of whether the Judgment under review is to be affirmed or reversed.

We are confronted with specifications that the District Court erred in the following respects:

1. In denying Plaintiff's Motion for Directed Verdict on the Issue of Liability made at the close of the defendant's case and renewed at the close of all the evidence as the evidence conclusively established defendant's breach of implied warranty of reasonable fitness for human consumption and use. * * *

2. In charging the jury that a breach of implied warranty of reasonable fitness for human consumption and use occurs only if defendant's cigarettes endanger "any important number of cigarette smokers—any responsible number—any large segment * * any responsible segment of the general public * * * as to the threat of lung cancer," such surprise charge having effectively directed a verdict for defendant * * *.

3. In permitting defendant's expert witnesses to testify that they do not know the cause of lung cancer and that nobody knows the cause of lung cancer * * *.

4. In excluding certain kinds of evidence, i. e., testimony concerning (1) animal experimentation and (2)

the 'Report of the Surgeon General's Committee' and other scientific authorities as well as work done by the testifier with other persons * * *.

We shall dispose of minor matters first.

■ In our view, the trial court denied both sides an opportunity to offer evidence of out of court experiments on animals and this was not erroneous, Bish v. Employers Liability Assurance Corp., 5 Cir., 1956, 236 F.2d 62; Travelers Insurance Company v. Wilkes, 5 Cir., 1935, 76 F.2d 701.

■ Neither did the Court commit reversible error in declaring inadmissible the surgeon generals report, Bish, supra; Rice v. Clement, Fla.App., 1966, 184 So. 2d 678.

■■ Of course, an expert may give an opinion based on the results of experiments by others and in that connection may describe such experiments, Woelfle v. Connecticut Mut. Life Ins. Co., 8 Cir., 1939, 103 F.2d 417, 418; Cf. International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201, 208. We have previously indicated our acceptance of the majority view that experts may not be cross examined by the use of scientific works unless they relied on the very work which the cross examiner wishes to use, Bish, supra.

■ We cannot reverse for the giving of the charge described in Specification No. 2. The giving of this supplemental charge was caused by a controversy after the jury had retired as to whether the Court had inadvertently used the word "admissions" instead of "findings" [of the jury in the first trial]. Out of a commendable desire to clear up any possible chance of error on this point, the Court had the jury called back into the courtroom, after which this took place:

"THE COURT: * * * I also told you that the question was one of a common danger to the general public as distinguished from Mr. Green. That is for your determination. And if these cigarettes did endanger any important number of cigarette smokers —any responsible number—any large segment of those smokers—then it would be a breach of the implied warranty for fitness, which is imposed upon the manufacturer who sells the cigarettes. If they did not, there would be no breach of warranty * *.

"MR. HASTINGS [Plaintiffs' counsel]: May we approach the bench?"

(Side Bar Conference out of the hearing of the jury)

"THE COURT: Counsel do not like the words 'important number'. They think that it is a little bit too definite. I mean does it endanger any responsible segment of the general public. Does cigarette smoking endanger them as to the threat of lung cancer? If it does, the implied warranty is violated."

From the foregoing it is quite plain to us that plaintiffs' counsel did object to the language of the supplemental charge, but he did not make the content of his objection a matter of record. Obviously, the Court then attempted to amend the charge so as to eliminate the objection, whatever it was. Thereafter, counsel offered no further exception. As amended, the language as to important numbers or large segments was, in effect, withdrawn. Thus, if there was any error in the amended supplemental charge, viewed as a whole, which we doubt, it certainly was not plain error. Therefore, in the absence of exceptions properly reserved we do not now consider it, Rule 51 Fed.R.Civ.P., 28 U.S. C.A.

■ Nor do we find any merit in appellants' contention that they were entitled to a directed verdict on the issue of liability. It is argued that the defendant's evidence was valueless and that this panel should now overrule the prior decision which constituted the law of the case on the second trial. Going to the heart of the matter, we simply say that the District Court had to retry the case under the directions he had received from this Court. The value of the evidence and all inferences reasonably to be drawn

therefrom, was as of the date of that particular trial for the jury to decide.

The second trial was a forensic battle of experts. The testimony of plaintiffs' expert witnesses tended to show that cigarette smoking causes approximately 10% of heavy [as the witnesses defined the term] cigarette smokers to die of lung cancer after about twenty years of smoking.

Appellee met this proof in the following manner:

Dr. Moran testified that in his studies and research he had attempted to find out the cause of lung cancer but, "I don't know the cause of it". To this point there was no objection. Dr. Moran was then asked if he had any reasonable medical opinion as to whether or not the smoking of cigarettes has any bearing upon lung cancer. *The plaintiffs' objection was overruled.* The witness then testified:

"Q. Can you say with reasonable medical certainty that smoking of cigarettes is the cause of lung cancer in the public?

A. No, sir.

Q. Do you know what does cause lung cancer or cancer in any other part of the body of a human being?

A. No, sir."

This was followed by other testimony:

DR. T. L. JACKSON:

"Q. Since you are in the cancer field, Doctor, do you know the cause of cancer?

A. I do not know the cause of cancer.

\*    \*    \*    \*    \*    \*

Q. Do you know of any definite link between smoking and lung cancer in people who smoke?

A. I do not know of any actual proven fundamental link between cigarettes and lung cancer
\*  \*  \*."

No objection was made to this testimony.

DR. HOCKETT:

"Q. Doctor, do you know the cause of cancer in the human body?

A. No, sir, I do not."

No objection was made to this testimony.

DR. FLIPSE:

"Q. Do you know the cause of lung cancer?

A. No.

Q. Do you think there is any causal connection between smoking and lung cancer?

A. Personally I don't believe there is; but that is a question that I cannot decide because we don't know the cause."

The following exchange then occurred:

"[DR. FLIPSE] We know many of the basal conditions that go with a change of cancer, but we don't know the cause.

Q. Sir, would you name some of the things that medicine is working on now to try to determine if that is a cause or is related to the beginning of cancer?

MR. HASTINGS:

We object. One of the bases if repetitious and, too, this is not related to whether cigarettes are or are not the reason—are reasonably fit for human consumption.

THE COURT:

Doctor, only speak as to your own knowledge, what you know. He is not asking you what you suspect but what you know.

I believe you answered part of it. Nobody knows the cause of cancer; is that right?

THE WITNESS:

Nobody knows the cause.

THE COURT:

You mean what he knows or what he suspects is the cause of cancer based upon his medical experience.

MR. BRADFORD:

Answer that question.

A.  Please read the question.

THE COURT:

Have you arrived at any conclusion based upon your medical knowledge as to the suspected causes of cancer?

THE WITNESS:

I have not."

Finally Dr. Flipse testified on cross examination,

"We cannot say it is due to something we inhale * * *. Basically, we don't know what causes it."

When the defense rested, the attorney for the Greens made the following motion:

"MR. HASTINGS:

Your Honor, before we recess, we would like to move to strike the testimony of Dr. Burford, Dr. Flipse, Dr. Little and Dr. Jackson, who gave opinions to the effect that there was no relationship between smoking and cancer on the basis that the Fifth Circuit clearly stated that any evidence adduced with regard to this must assume as conclusively established the fact that one man, Edwin Green, had died of cancer of the lung as a result of smoking; and therefore we feel that the testimony by these witnesses should not be considered.

THE COURT:

Denied."

It will now be recalled, and it is appropriate that we should emphasize it, that the prior jury had expressly found that smoking Lucky Strike cigarettes was one of the proximate causes of the cancer and that the cancer thus caused was, in turn, one of the proximate causes of death. We likewise recall the emphatic, explicit instructions of this Court when it remanded the case that the parties were bound by these findings and *that the parties could not relitigate the issues thus already decided under the guise of presenting evidence on the issue of reasonableness.*

■■  Appellee says that this line of testimony should have been admissible for the reason that if the cause of can-

cer is unknown then it cannot be said that cigarettes [as a cause of cancer] are not reasonably fit and wholesome for consumption by the general public. We do not feel that juries may be required to return verdicts on choices between mutually impossible propositions. Although the jury in this second trial was unalterably bound, and so informed, by the finding of its predecessor that cancer had indeed been a cause of the death of Mr. Green and that smoking Lucky Strike cigarettes had been one of the proximate causes of that cancer, it repeatedly heard from experts which it had the inherent province of believing, if it chose, that such could not possibly be true since none know the cause of cancer and, therefore, cannot prove the cause. That was not the standard upon which this Court directed that the case should be retried. There was express direction that the cause of death must not be relitigated in the course of settling the question of reasonable safety for use by the general public.

In all fairness, we must likewise recognize the equally distressing predicament of the trial judge. At the first blush he was presented with the previously determined fact that deceased had died from the use of a product, and then he was told to preside over the determination of whether such a product nevertheless was reasonably safe for use by the general public.

The answer to this dilemma, in our judgment, was that appellee could have rebutted plaintiffs' proof as to the incidence of lung cancer in cigarette smokers without presenting testimony categorically contradictory to that which had already been found as a fact.

For these reasons, this judgment must be reversed and remanded for a new trial.

## II.

The matter does not end here.

■  In the absence of some material change of controlling state law, occurring since the date of our former decision, December 11, 1963, 325 F.2d 673,

the directions of our former remand remain the law of this case and would have to be adhered to on the second remand.

On the other hand, if there has been a material change in the controlling state law, either by enactment or by clarifying interpretation, we are bound to follow the law as it now exists. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941); Huddleston v. Dwyer, 322 U.S. 232, 64 S.Ct 1015, 88 L.Ed. 1246 (1944); Jones v. Schellenberger, 7 Cir., 1955, 225 F.2d 784, cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956).

After the argument of this appeal we requested the parties to file, and we have received, briefs on the question of whether such a change has, indeed, taken place.

■■■ There no longer remains any doubt of the power and duty of this Court in proper cases to direct the entry of a judgment n. o. v., Neely v. Martin K. Eby Constro. Co., Inc., 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967).

We have heretofore referred, at page 100, to the language of the Supreme Court of Florida when it answered our certified question, as follows:

> "The contention that the wholesomeness of a product should be determined on any standard other than its actual safety for human consumption, when

supplied for that purpose * * * [is] one which we are persuaded has no foundation in the decided cases."

We must emphasize the words "actual safety" appearing in the above passage.

Then, as already pointed out, page 101 ante, after the second trial below [the trial now under consideration] the Supreme Court of Florida, in McLeod v. W. S. Merrell Co., Div. of Richardson-Merrell, Inc., supra, May 5, 1965, took occasion to explain what it had meant in Green v. American Tobacco Company, Fla., 154 So.2d 169. It said that on the facts of this case it had applied the rule of *absolute* or strict liability (see quotation alluded to).

■■■ On April 28, 1965, the Supreme Court of Florida decided the case of Foley v. Weaver Drugs, Inc., 177 So.2d 221. The accused product was a bottle which contained reducing pills. When the prospective user attempted to open the bottle by unscrewing the top it broke, fragmented, and thus lacerated her right wrist. Suit was brought on negligence and breach of implied warranty. The Supreme Court held that a retailer's implied-warranty liability as to food did not extend to this container. In the course of arriving at this decision, however, and referring to cases previously decided as to tinned meat, and canned sardines,[3] the Court stated that it had

---

3. Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313 (1944); Sencer v. Carl's Market, 45 So.2d 671 (Fla., 1950). Other Florida decisions as to products intended for human use are:

(1) Human blood used in transfusions, Russell v. Community Blood Bank, 185 So.2d 749 (Fla.1966); Community Blood Bank v. Russell, 196 So.2d 115 (Fla. 1967).

(2) Candy bar, Wagner v. Mars, Inc., 166 So.2d 673 (Fla.App.1964).

(3) Soft drinks, Miami Coca Cola Bottling Co. v. Todd, 101 So.2d 34 (Fla. 1958).

(4) Restaurant food, Cliett v. Lauderdale Biltmore Corp., 39 So.2d 476 (Fla. 1949).

We note that as to food or products intended for human use generally the Florida cases make no reference to "reason-

able fitness" or "reasonable wholesomeness".

These limitations have been applied, however, to products not intended for human consumption, as in Wisner v. Goodyear Tire and Rubber Co., Fla.App., 167 So.2d 254 (1964) involving pipe for use in residential lawn sprinkling systems, and Renninger v. Foremost Dairies, Inc., 171 So.2d 602 (Fla.App.1965) cited in the text.

We think the Florida cases are in agreement with what the Supreme Court of Texas held in McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, June 7, 1967, that "no sound distinction can be drawn between the use of an eye-wash solution that impairs or destroys vision and a foodstuff which causes illness". Russell v. Community Blood Bank, above cited, is to that effect.

twice previously affirmed the principle that

> " * * * as to items of food or other products in the original package which are offered for sale for human consumption or use generally, a person who purchases such items in reliance upon the express or implied condition or assurance that they are wholesome and fit for the uses or purposes for which they are advertised or sold, and who is injured as the result of the unwholesome or deleterious substances therein which are unknown to the buyer, may hold either the manufacturer or the retailer liable in damages for injuries sustained by him, on the theory of an implied warranty of wholesomeness or fitness of such article or product for the purposes for which it was offered to the public".

*Foley* was decided two years after our original remand and directions in this case. The significant thing is that as to products intended for human use generally neither *McLeod* nor *Foley* anywhere modified or limited the requirement of fitness or wholesomeness to "reasonable fitness" or "reasonable wholesomeness".

On February 9, 1965, the District Court of Appeal of Florida, Third District, Renninger v. Foremost Dairies, Inc., 171 So.2d 602, cert. denied, Florida Supreme Court, 177 So.2d 480, decided Renninger v. Foremost Dairies, Inc., involving a defective milk bottle. While imposing the reasonable fitness limitation to this object not intended for human consumption, the court nevertheless quoted verbatim the foregoing passage from *Foley*.

In the light of these decisions, rendered subsequent to our former opinion, we are now left in no substantial doubt that under Florida law the decedent was entitled to rely on the implied assurance that the Lucky Strike cigarettes were wholesome and fit for

the purpose intended and that under the facts found by the jury his personal representative and widow are entitled to hold the manufacturer absolutely liable for the injuries already found by a prior jury to have been sustained by him.

This being so, in addition to reversing this judgment and remanding for a new trial we must also direct the District Court to enter judgment for the plaintiffs on the issue of liability and to submit the issue of damages to another jury.

Reversed and remanded, with directions.

SIMPSON, Circuit Judge (dissenting):

With deference, I dissent from the majority opinion. I view the second trial of this case as having been fairly conducted under the standards laid down by this Court on remand, Green v. American Tobacco, 325 F.2d 673. Further, I can perceive no "cogent reason"[1]—either a change in controlling law or any other—for reversing the prior panel of this Court and directing that the court below enter judgment n. o. v. for plaintiffs on the issue of liability.

### I.

I understand Part I of the majority opinion to hold the trial judge in error for refusing to strike the testimony of the defendant's expert witnesses quoted on pages 103 and 104 of the opinion, to the general effect that they did not know the cause of cancer, and that they did not believe there was a causal connection between smoking and lung cancer. This line of testimony was opened up by and in direct response to testimony by the plaintiffs' experts to the effect that cigarette smoking causes lung cancer in a sizeable part of the smoking population, that one out of nine or ten heavy cigarette smokers die of lung cancer, that 30,000 or 35,000 deaths yearly in the United States are caused by lung cancer caused by cigarette smoking and that

---

1. Lumbermens Mutual Casualty Co. v. Wright, 5 Cir.1963, 322 F.2d 759 at 763; cert. denied 354 U.S. 939, 77 S.Ct. 1397,

1 L.Ed.2d 1536; Lincoln National Life Insurance Co. v. Roosth, 5 Cir.1962, 306 F.2d 110.

there is a much greater incidence of lung cancer in the half of the adult population that smokes. The jury was left to draw the inference that defendant's cigarettes are not reasonably fit for human consumption.

It should be noted that *plaintiffs'* expert witnesses testified either on direct or cross-examination to similar lack of knowledge as to the cause of cancer.[2]

That long, costly and intensive research in depth aimed at discovering the cause or causes of cancer by both public and private agencies is continuing, and is so far unsuccessful is a matter of general, practically universal knowledge. It is a fact of our daily life as well known to laymen as to doctors or judges. Of course it was known to the members of this jury. The receipt of this intelligence could hardly have come as a shock to them.

In his jury instructions the trial judge made it abundantly clear that "in a previous determination it was determined that one of the proximate causes of his (Edwin Green's) death was the smoking of these cigarettes." Earlier the jury had been instructed: "It has been determined that Green smoked cigarettes and one of the proximate causes of his death was lung cancer caused by cigarettes. But now we are not concerned particularly with Green. We are concerned with whether or not cigarettes are reasonably fit and wholesome for the use of the general public to whom they are sold."

It was iterated and reiterated by the instructions that the sole factual issues were (1) whether cigarettes are reasonably fit and wholesome for consumption by the public and (2) if they are not, what were plaintiffs' proven damages. This was exactly the issue upon which the case was remanded for trial.

There is simply no basis for the majority's conclusion that the admission of this testimony confused the jury "as to that which had already been determined to be a fact."[3]

### II.

It would be harmful enough to this defendant, who has twice won this case before a jury, if the majority opinion stopped at the end of Part I. True, the parties would be put to the time, the trouble and the expense of yet another jury trial, but perhaps upon another trial on the issue directed to be tried by the earlier panel of this Court, the trial court could limit the testimony of the defendant's experts in a manner to fit the objections of the majority.

But, the majority opinion says, "The matter does not end here". In Part II of the opinion, it reaches the conclusion, assertedly based on two Florida Supreme

---

2. Dr. Winder: "Nobody knows what the basic cause of cancer is * * *" (R. 184) (Direct). Dr. Levin: "there is no known essential cause of * * * any form of cancer. As a matter of fact we are not even sure that cancer is a disease that has an essential cause." (R. 328–329) (Cross). Dr. Heller: "It is a virtual impossibility to particularize upon a cause of any cancer in a single individual" (R. 231) and "We do not know the reasons why cells proliferate and become invasive cancers". (R. 234) (Cross). Dr. Tate conceded that his position "boils down to" getting rid of cigarette smoke "until we find out the cause". (R. 390) (Cross).

3. The conclusion that the jury was confused is further refuted by footnote 14.5h of Frumer and Friedman's, Product's Lia-

bility, Vol. 2, § 16.03[4], wherein the jury foreman on the second trial of the case was quoted as saying: "If we had to decide if cigarettes are safe, we would have said 'no' Mr. Mucino, a 35-year-old savings and loan company executive, said. But the judge told us specifically to decide if cigarettes are reasonably safe and wholesome for human consumption. We were told to assume Mr. Edwin M. Green died of cancer. *We didn't determine that. We decided the key word was 'reasonable.'* What is absolutely safe? For some people smoking is not safe; for others it is. Is 20 to 30 years reasonable? We decided it was." New York Times, Nov. 30, 1964. (Emphasis added). This extrajudicial source reveals that the jury was anything but misled.

**108**

Court cases [4] decided since the certification proceedings, that there has occurred a material change in controlling legal principles since the decision of the prior panel on the first appeal of this case, 325 F.2d 673. On this predicate the trial court is directed to enter judgment n. o. v. as to liability and to limit the third trial to the sole issue of damages.

I fail to find any material change in Florida law by reason of *McLeod* and *Foley,* supra. Indeed, further post-*Green* pronouncements of the Florida Supreme Court point to a diametrically opposite conclusion, to be commented upon later in this dissent.

*McLeod* decided that two retail druggists were not liable under an implied warranty of fitness for dispensing in the manufacturer's original container upon physician's prescription a drug known as "Mer/29" (advertised as a commodity for controlling body cholesterol) to a customer who suffered injury from taking the drug as directed by the physician. The petitioner (plaintiff-customer below) contended that the advisory opinion in Green v. American Tobacco Co., Fla., 154 So.2d 169, sustained his position.

In disposing of this contention the Florida Supreme Court said:

"There are several distinguishing elements. Green was a suit against a manufacturer. It involved a commodity which was available indiscriminately to the public generally. Green can be summarized as a case which applied a rule of absolute or strict liability to the manufacturer of a commodity who had placed it in the channels of trade for consumption by the public generally. The case before us is lacking in many of these significant elements."

The language just quoted includes that quoted on page 101 of the majority opinion, and which is advanced at the top of page 105 of the opinion as categorically stating that Green applied the rule of absolute or strict liability to the situation now before us.

The majority seems to be captivated by the characterization in *McLeod* that *Green* "applied a rule of absolute or strict liability to the manufacturer of a commodity who had placed it in the channels of trade for consumption by the public generally". In *Green* the Florida Supreme Court did apply a rule of absolute or strict liability in the sense that it said that liability *did not depend upon knowledge or foreseeability of harmful effects.* This was the question before it. Nevertheless, as the prior panel in this case recognized it made clear that this absolute or strict standard was to be applied to *reasonable* fitness for consumption.

The portions of the *McLeod* opinion quoted by the majority standing alone and out of context may plausibly appear to support the holding of the majority. However, immediately following the portion of *McLeod* quoted by the majority, we find further elaboration as to exactly what is involved in the *McLeod* case. The court stated: "In effect, the petitioner McLeod is asking us to impose upon these retail prescription druggists an absolute, strict liability *without fault* in an action in tort." (Emphasis added) 174 So.2d at 739. On the same page, while summarizing its holding, the court further added: "The concept of strict liability *without fault* should not be applied to the prescription druggists in the instant situation." (Emphasis added).

From the foregoing language, nothing could be clearer than that strict liability *without fault* is, and *has been,* well recognized by the Florida courts. Cliett v. Lauderdale Biltmore Corp., 39 So.2d 476 (Fla.1949); Sencer v. Carl's Market, 45 So.2d 671 (Fla.1950). Where my brethren go astray is in equating the entirely separate concept of strict liability without fault with strict liability without re-

4. McLeod v. W. S. Merrell Co., Div. of Richardson-Merrell, Inc., 174 So.2d 736 (1965); and

Foley v. Weaver Drugs, Inc., 177 So.2d 221 (1965).

gard to a product's reasonable fitness for consumption or use by the general public.

*Foley,* the other case relied upon by the majority, involved the implied warranty liability of a retail druggist for a defect in a container for reducing pills, known as "Thindown", the container being a glass bottle which closed with a screw-on top. The purchaser's wife attempted to open the bottle by unscrewing the top. The bottle broke, fragmented, and one piece lacerated her right wrist. The Florida Supreme Court took the case upon certiorari because the holding below that the plaintiffs had no cause of action against the retailer for breach of an implied warranty of fitness and merchantability was in direct conflict with Canada Dry Bottling Co. of Fla. v. Shaw, 118 So.2d 840 (2d D.C.A.1960), decided by the Second District Court of Appeal imposing liability upon both bottler and retailer. The case under review was approved and *Canada Dry* disapproved. *Foley,* therefore, stands for the proposition that as to defective containers causing injury Florida will not impose upon retailers liability for implied warranty of fitness. It decided nothing whatever with respect to liability of either manufacturer or retailer upon implied warranty with respect either to food or other product intended for human consumption. The Florida Supreme Court stated *(Foley,* page 227, 177 So.2d) that the exact question before it had not theretofore been presented to that court. It proceeded to discuss its prior holdings imposing liability upon both retailer-seller and manufacturer of foodstuffs sold in sealed containers for injuries caused by unwholesome or deleterious substances therein, citing Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313 (1944) (manufacturer and packer of tinned meat), Sencer v. Carl's Market, 45 So.2d 671 (Fla.1950) (retailer-seller of canned sardines), and Cliett v. Lauderdale Biltmore Corp., 39 So.2d 476 (Fla.1949) (unwholesome food served in dining room). It said that "as stated in the *Cliett* case, supra, and reaffirmed in Sencer v. Carl's

Market, supra, 45 So.2d 671, 672", and then proceeded to set forth the language quoted by the majority at the top of page 106 of the majority opinion. The point here is that all these cases were before and discussed by the Florida Supreme Court when it answered our certified question at 154 So.2d 169. The *Blanton* case is quoted in footnote 7, on page 171, coupled with a citation to *Cliett.* The holding in Sencer v. Carl's Market is discussed extensively on page 171. By no interpretation, no matter how strained, could *Foley* logically or reasonably be viewed as a change in applicable Florida law when the portion of the opinion relied on by the majority is a quote from a Florida case decided eighteen years ago.

The references in *Foley* and *McLeod* to the holding of *Green* as establishing strict liability must be read in context. In these and other cases the reference to strict or absolute liability has reference *only* to the long followed concept that liability is imposed for *defective* products regardless of whether the defect could have been discovered by the manufacturer. This is a common use of terminology to distinguish between the negligence concept of fault as opposed to the implied warranty concept of liability regardless of fault. Carter v. Hector Supply Co., 128 So.2d 390 (Fla.1961); Cliett v. Lauderdale Biltmore Corp., supra; and Miami Coca Cola Bottling Co. v. Todd, 101 So.2d 34 (Fla.1958).

It is significant to me that neither in their original brief nor in their reply brief did the appellants, despite urging this Court to reverse the prior panel, refer in any way to either *McLeod* or *Foley.* To further emphasize the radical interpretation the majority now places on *Foley,* we note that plaintiffs' counsel in the instant case were likewise counsel in *Foley.* Yet *Foley* was not cited or relied upon—nor even referred to—by plaintiffs until *after* this court requested supplemental briefs from counsel as to whether or not *McLeod* and *Foley* required that judgment n. o. v. be entered for the plaintiffs on liability. These are

capable and experienced Florida lawyers, especially skilled in representation of plaintiffs in personal injury and death cases, including specifically cases involving products liability. It strains credulity to assume that their failure to cite *McLeod* and *Foley* originally was the product of oversight. Rather, the more logical conclusion is simply that *Foley* and *McLeod* were not relied upon by plaintiffs' counsel for the obvious reason that neither case stands for the proposition for which it is cited by my brethren. The theory that these two cases signal a departure by the Supreme Court of Florida from the advice given us at 154 So.2d 169 is completely original with the majority opinion in this case.

In substance, my position is that the majority has failed to recognize the uniqueness of the situation presented. We are not dealing with an obvious, harmful, foreign body in a product. Neither do we have an exploding or breaking bottle case wherein the defect is so obvious that it warrants no discussion. Instead, we have a product (cigarettes) that is in no way defective. They are exactly like all others of the particular brand and virtually the same as all other brands on the market. The statement of Judge Goodrich, in a concurring opinion in Pritchard v. Liggett and Myers Tobacco Co., 295 F.2d 292, 302 (3 Cir. 1961), is equally applicable here:

> "If a man buys whiskey and drinks too much of it and gets some liver trouble as a result I do not think the manufacturer is liable *unless* (1) the manufacturer tells the customer the whiskey will not hurt him or (2) the whiskey is adulterated—made with methyl alcohol, for instance. The same is surely true of one who churns and sells butter to a customer who should be on a nonfat diet. The same is true, likewise, as to one who roasts and sells salted peanuts to a customer who should be on a no-salt diet. Surely if the butter and the peanuts are pure there is no liability if the cholesterol

count rises dangerously." (Emphasis added).

It is significant to note that in the instant case there has never been even an attempt to prove either of the two above listed exceptions. Inability to prove a specific defect would not preclude liability if there was proof the product was unreasonably dangerous without a defect.

Even under the new strict liability in tort (as opposed to an action in warranty) theory found in Section 402A of the Restatement of Torts (Second), Comment i provides: "Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous."

On March 1, 1967, the Florida Supreme Court decided the case of Community Blood Bank Inc. v. Russell, 196 So.2d 115, and provided several indications as to the precise holding in *Green* and the state of the law in Florida. *Russell* involved the liability of a blood bank for blood sold containing the medically undetectable and unremovable serum hepatitis. In reviewing the action of the District Court of Appeal, the court cited *Green* with approval as authorizing remand *"for trial on issues of fact."* (Emphasis supplied) 196 So.2d at 117. Such a recent pronouncement by the Florida Supreme Court in *Russell* that *Green* was properly remanded by the prior panel, certainly runs counter to the majority's decision that judgment should be entered for the plaintiffs on liability as a matter of law.

Justice Roberts of the Florida Supreme Court filed a specially concurring opinion in *Russell*. His views are interesting, though concededly not an expression binding the Court. In his special concurrence in *Russell* he indicates that to allow avoidance of liability because of inability to detect or remove the serum hepatitis "runs counter to the very basis of the strict or implied warranty theory of liability—that is, *liability without fault*—and is in direct conflict with the decision of this court in Green v. American To-

bacco Co., supra, 154 So.2d 169." 196 So. 2d at 119 (Emphasis added).

At another point Justice Roberts explained the court's holding in *McLeod* as follows: "[W]e held that the retail druggist could not be held liable on the theory of breach if [sic] implied warranty of merchantability where the drug supplied to the plaintiff was, in fact unadulterated." 196 So.2d at 120. It was Justice Roberts' observation that the key word was "unadulterated". To further explain, he added:

"There is a clear distinction between a product which is not adulterated— one which meets all the standards established for a particular product but which is attended with a known risk to the consumer—and a product which is, in fact, adulterated and defective— that is, which does not meet the standards established for this particular product—and which would, because of such unknown and undetectable defect, produce a harmful effect upon *any* consumer thereof." 196 So.2d at 120 (Original emphasis).

Justice Roberts then concluded that *McLeod*, in which there was no liability, was distinguishable because there was no defect or adulteration, but that there should be liability in *Russell* because the blood was in fact adulterated or defective by virtue of the presence of the serum hepatitis albeit undetectable and unremovable.

If Justice Roberts' elaboration is taken as correct, and certainly nothing was said or decided in *Foley* or *McLeod* which in any way contradicts the above quoted passage, then the Florida position on implied warranty is clearly one in which there has to first be an actual adulteration in the product before there can be liability from harm resulting from its use. Dean Prosser has reached the same conclusion, i. e., that "there is no strict

liability when the product is fit to be sold and *reasonably safe for use. * * * "* [5] (Emphasis added).

It has been firmly established by the prior panel for purposes of this case that the cigarettes are not adulterated:

"There has never been presented by the evidence any contention that Lucky Strike cigarettes were more dangerous or had a greater propensity to cause lung cancer than cigarettes bearing other brand names. Nor has there been any contention that the cigarettes which Mr. Green smoked contained any foreign substance, or any spoiled, contaminated or other substandard ingredient which caused his injury and death. Instead, plaintiffs' contention from the beginning has been that cigarettes—not Lucky Strike cigarettes alone—cause lung cancer." 325 F.2d at 676.

My research has not revealed any Florida decision finding a manufacturer liable in which there was not some defect or adulteration in the product. For the majority now to decide that proof of a defect or adulteration (or at least that the harmful effects of the product are felt by a substantial segment of the public) is no longer necessary, as a matter of law, goes far beyond anything yet decided or even foreshadowed in the Florida decisions.

One further source will be discussed relative to my position in this dissent, and that is the Florida Supreme Court's advisory opinion in this case. At the outset the Florida Supreme Court was careful to delineate what it was and was not called on to decide. The first pertinent portion of the opinion is as follows:

"We conclude also that the question thus framed does not present for our consideration the issue of whether the cigarettes which caused a cancer in this particular instance were as a matter of law unmerchantable [2] in Florida un-

---

5. Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 812 (1966).

der the stated conditions, nor does it request a statement of the scope of warranty implied in the circumstances of this case." 154 So.2d 170.

Further on the court stated that it likewise was not called on to decide whether the product was reasonably fit and wholesome for its general purpose.

In footnote 2 to the preceding quotation, the Florida court refers to Section 25 of Frumer and Friedman, Products Liability, wherein cases are collected involving products whose contents are sufficiently repulsive so as to require no proof of unwholesomeness. Such cases include those where the product contained mice, flies, slime, mud, bugs, roaches and worms. Little doubt exists that the presence of such articles in a product intended for human consumption renders said product unwholesome or unmerchantable as a matter of law.

The same footnote refers to Section 29.03[1] of Fruman and Friedman which the court noted discussed "the problem of individual reactions to ordinarily harmless substances", [the theory on which this case was tried the second time, after remand] "discussion of which we deem unwarranted here because of the lack of Florida precedent and the limited issue posed in this non-adversary proceeding."

Again, in footnote 11 the Florida Supreme Court quotes with approval Frumer and Friedman's analysis of a Wisconsin case to the effect that: ' " 'What

is to be *reasonably expected* by the consumer is a *jury question in most cases;* \* \* \* This test as applied to an action for breach of the implied warranty is keyed to what is *"reasonably fit" ' " '.* (Emphasis added)

The majority has relied at pages 100, 101 and 105 of the majority opinion on the "actual safety" language of the Florida Supreme Court as establishing liability. Such reliance is misplaced. If the construction by the majority is correct, American Tobacco has been made an insurer.

In my view what and all that is said about "actual safety" is that it is paramount to industry standards. The latter portion of the paragraph on page 173 of *Green* makes it clear that the Florida Supreme Court's references to the "actual safety" of a product were not intended to be construed as a modification of the test of whether a product is reasonably fit for human use and consumption.[6]

It is my opinion that the above mentioned guarded statements of the Florida Supreme Court as to what it was *not* called on to decide as well as the footnoted references to vitally important areas of products liability defense which were not to be discussed is a clear indication that the action of the prior panel in remanding for a new trial as to the cigarettes' reasonable fitness was eminently correct. Any other conclusion would be supported only if the Florida

---

**6.** "The contention that the wholesomeness of a product should be determined on any standard other than its actual safety for human consumption, when supplied for that purpose, is a novel proposition in our law, and one which we are persuaded has no foundation in the decided cases. To hold that prevailing industry standards supplant the ordinary standard of objective truth and proof, and should be conclusive on the issue of a product's *reasonable fitness for human use or consumption,* would be to shift to the purchaser the risk of whatever latent defectiveness may ultimately be proven by experience and advancement of human knowledge, a risk which we are convinced was from the inception of the implied warranty doctrine intended to be attached to the mercantile function. There exists, we think, no real alternative and no valid objection to this distribution of the burden, if the public health is to be protected in any practical sense from exploitation by those who, for a profit motive, undertake to supply the vast and ever increasing variety of products which the people by unprecedented powers of commercial persuasion are daily urged to use and consume." (Emphasis added) 154 So.2d at 173.

Supreme Court had clearly and affirmatively ruled that when the defendant's cigarettes caused the plaintiff's fatal cancer, as the first jury had found and of which the Florida Supreme Court was aware, the Lucky Strikes were unmerchantable as a matter of law. The Florida Supreme Court's decision in *Green* has never been criticized by that court. Nor has the Florida Supreme Court ever indicated that the prior panel of this court was incorrect in remanding for a new trial, limited to the question of whether Lucky Strikes were "reasonably fit and wholesome." Indeed, the Florida Supreme Court specifically approved of the remand in *Green* "for trial on issues of fact." Community Blood Bank, Inc. v. Russell, supra.

A final supporting reference can be found in Fruman and Friedman, supra, Vol. 2, § 16.03[4], p. 62, wherein the authors analyzed the Florida Supreme Court's opinion in *Green* and concluded that "Whatever the scope of the warranty, the tenor of the opinion is that it is at least *for [the] jury* to say whether cigarettes which cause cancer \* \* \* are reasonably fit for human consumption, unfettered by limitation that [the] manufacturer does not warrant against unknowable risks." (Original emphasis) Even though the authors are not in accord with what they view as the Florida position, their conclusion that the issue of reasonable fitness is for the jury is at odds with the construction of the opinion by the majority of this panel, viz: that this issue should be decided as a matter of law.

Further, it should be emphasized, as set forth in the majority opinion of the prior panel. (325 F.2d 673, at page 676, under headnote 2) that the original jury was charged as follows:

"The manufacturer of products which are offered for sale to the public in their original package for human consumption or use *impliedly warrants that its products are reasonably wholesome or fit for the purpose for which they are sold*, but such implied warranty does not cover substances in the manufactured product, the harmful effects of which no developed human skill or foresight can afford knowledge." (Emphasis supplied in original opinion)

Judge Rives then points out that this was taken verbatim from plaintiffs' requested written instruction No. 11 as to which the plaintiffs consented to the insertion of the adverb "reasonably" to modify "wholesome or fit", and that defendant did not object to the emphasized portion. Judge Rives continued: "As a part of the law of this case the parties are, therefore, bound by the *scope* of the implied warranty as so defined by the district court." (Emphasis mine.)

Thus, (1) on the first trial the district court and both parties recognized "reasonably wholesome or fit" as the scope of the implied warranty as the law of the case, (2) the Supreme Court of Florida recognized it as the scope of the implied warranty, (3) this Court on the prior appeal specifically identified this concept as the law of the case, and directed the lower court to follow it on retrial, (4) upon retrial the lower court carefully followed directions, and (5) there has been no intervening change in the applicable Florida law. If there is such a thing as the "law of the case" *ever* being permanently and impregnably established, the series of events listed above should establish for all time and for all purposes *of this case* that the scope and nature of the implied warranty here is one of "reasonable wholesomeness and fitness for use by the public."

By a stroke of the majority's pen this consistent treatment of the question by the parties and by all the courts involved is obliterated from the record. It is as though what the record clearly shows did happen never happened at all. On the record before us, I cannot concur.

Respectfully, but vehemently, I dissent from the holding of both Part I and Part II of the majority opinion. I would affirm the trial court and write "FINIS" to this long and troublesome litigation.