Mary GREEN, Appellant,

v.

The AMERICAN TOBACCO COMPANY,
Appellee.

Edwin GREEN, Jr., as Administrator of
the Estate of Edwin Green, deceased,
Appellant,

v.

The AMERICAN TOBACCO COMPANY,
Appellee.

No. 22435.

United States Court of Appeals
Fifth Circuit.

April 8, 1969.

Rehearing Denied July 7, 1969.

Lawrence V. Hastings, Irma Robbins Feder, Miami, Fla., for appellants.

A. Lee Bradford, Miami, Fla., Edward R. Neaher, New York City, for appellee.

ON PETITION FOR REHEARING
EN BANC

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, SIMPSON and MORGAN, Circuit Judges.

PER CURIAM:

The Court sitting en banc recedes from and overrules the decision of the majority of the panel in this case.[1] Both Parts I and II of the opinion are overruled by the Court. We affirm the judgments of the lower court for the reasons and upon the principles set forth in Judge Simpson's dissent, 391 F.2d at 106.

Affirmed.

COLEMAN, Circuit Judge, with whom JOHN R. BROWN, Chief Judge, and GODBOLD, Circuit Judge, join, dissenting:

I respectfully dissent.

I do not propose to replay the long history of this litigation as compiled in

1. Green v. American Tobacco Company, 391 F.2d 97, 1968.

this Court, in the District Court, and in the Supreme Court of Florida on certificate. A general resume may be found in the prior panel decision, 391 F.2d 97.

The one inescapable consideration is that a jury found as a fact that Mr. Edwin Green, Sr. died of primary cancer of the lung, caused from smoking Lucky Strike cigarettes. This finding was *affirmed by this Court*, 304 F.2d 70 (1962); 325 F.2d 673 (1963). The decisive point is that when a jury so *found* there simply remained no further strict liability factual issue in the case.

This Court one time certified the case to the Supreme Court of Florida to settle a narrow question of Florida law. That Court responded. It later took occasion to state exactly what its reply stood for, to-wit, *"Green* can be summarized as a case which applied a rule of absolute or strict liability to the manufacturer of a commodity who had placed it in the channels of trade for consumption by the public generally", quoted in the prior opinion, 391 F.2d 101.

Yet, our Court, en banc, is now about to hold that he who sells for profit a product which caused the dread disease of cancer and also caused that ultimate of all dreads, death itself, can wiggle out of it by convincing a lay jury in a swearing match among super-scientists that such a product may somehow be reasonably safe for personal consumption by the general public. Because I do not believe that the Supreme Court of Florida would approve such a result, I persist in my refusal to do so.

The American Tobacco Company sold a product intended to be smoked. It contained an ingredient which caused cancer and death. The evidence shows that there was no way then, and there is none now, to foretell the identity of the person upon whom the fatal consequences will be visited. Yet, as happened to Mr. Green, *it is certain they will occur to some.* If one plays Russian Roulette with a revolver containing ten chambers but loaded with one bullet there may be only one chance in ten that he will be shot. I doubt, however, that this Court would hold that the practice raises a jury issue as to its reasonable fitness for common use by the general public. Without resort to any court, the common sense of mankind teaches that such lethal games are inherently dangerous, even if some of the players do escape. The same must be true as to any deadly product. As to cancer-causing cigarettes, one must ask, how can anything, as a matter of fact, be reasonably fit for use by the general public when it is known to kill and no one knows whom it will kill?

If every user of the product is thus exposed to cancer and death, then how, as a fact, can it be reasonably fit—for one or for a million? The inquiry is not answered by proclaiming that a known killer failed to infect or to kill millions of others, who fortunately escaped its effects.

Any product for personal use, of whatever name or content, which causes cancer has no better claim to fitness as a fact than that accorded a poison. I think this Court should say so, and I am sorry that it believes otherwise. Yet, it seems quite clear that if we had a seller of canned meat before us he would get nowhere in an absolute liability case by claiming that only one container in a million contained poison and he is not liable since only a few people were killed. Why the legal distinction between a package of cigarettes and a can of meat? I submit that there is none.

Omitting repetitious discussion of the Florida cases cited in the panel opinion, 391 F.2d at 105, involving such products for human consumption as tinned meat, canned sardines, candy bars, soft drinks, and restaurant food, it is to be remembered that in none of these cases was it hinted that the seller might have avoided liability by proving that (while the plaintiffs were injured by the deleterious substance) numerous others suffered no injury from using or consuming it.

Our late Brother Cameron hit the nail on the head when he wrote, of this case, 304 F.2d 81, 82:

"I think the Florida cases establish a rule of law which constitutes a condition of every sale of a product for human consumption or use, which has the same legal effect in this case as if appellee had entered into a written contract with decedent, covering every package of cigarettes purchased by him, couched in these words:

"American guarantees that the cigarettes contained in this package are fit to be used by purchaser, a human being, by lighting and drawing smoke from them into the lungs, so that the ingredients of the cigarettes carried in the smoke may be deposited on the walls of the blood vessels situated therein, to the end that said ingredients will be absorbed into the blood stream and will produce in the smoker the soothing and relaxing sensations normally attending such use; that said cigarettes do not contain any harmful or deleterious substance; and that it will indemnify the user against any injury, loss or damage which may result from the smoking of said cigarettes."

It is not to be overlooked that what the majority of the Court is doing here is to leave the law on the sale of cancer producing products to the divergent views of as many juries as may hereafter be empanelled on the subject. Yet, no court would ever do this if it were dealing with any other known poison, which, incidentally, a victim might have a chance to recover from.

With deference, I adhere to the result reached in the prior opinion. Upon the factual finding of the jury, I would hold American Tobacco Company liable as a matter of law and leave it to another jury to assess the damages. See 13 A.L.R. 3rd 1049 (1967).

I must likewise state my disagreement with the action of the Court, en banc, refusing to certify this question to the Supreme Court of Florida for a direct, specific ruling on the Florida law applicable to this situation. It will not be denied that in this diversity case we must apply state law. Federal courts do not make the law with reference to state questions but merely ascertain and apply it, Huddleston v. Dwyer, 322 U.S. 232, 64 S.Ct. 1015, 88 L.Ed. 1246; Meredith v. City of Winter Haven, Florida, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9; Smithey v. St. Louis Southwestern Railway Co., 8 Cir., 1956, 237 F.2d 637; Polk County, Georgia v. Lincoln National Life Insurance Co., 5 Cir., 1959, 262 F.2d 486.

While it may be argued that no further delay in the disposition of this long pending case should be tolerated, I would hold that at least in matters of cancer and health, life and death, we should give the Supreme Court of Florida an opportunity to settle the issue, especially since it is the only court which can do it with finality. I make no comment, beyond noticing it, that in this case a heavily docketed twelve judge court has been convened en banc to pass on an issue of state law in a diversity case, yet what we do can be reversed by the Supreme Court of Florida the next time it has the opportunity.

JOHN R. BROWN, Chief Judge, with whom COLEMAN and GODBOLD, Circuit Judges, join, dissenting:

I join unconditionally in the dissent of Judge Coleman. I would only add to it by emphasizing that—charged as we are with the duty to accept, try and pass on diversity cases—we are engaging in the wildest of guesses as to what the law of Florida is, or what the Supreme Court of Florida would say it is.

All of this adds up to the unfortunate consequence in this old, old case [1] of the failure to use properly and exploit fully the remarkable tool of certification to the Supreme Court of Florida. Indeed, it is still not too late.

---

1. The suit was filed over a decade ago in December 1957.

Of course certification was once had where, on rehearing of our initial decision,[2] we certified a question.[3] But the real trouble was that the question certified was too limited, too restrictive, too narrow.[4] The question stated zeroed in on only one phase—whether Florida law imposes on a manufacturer an absolute liability for death caused by using the product even though the manufacturer exercising reasonable human skill and foresight could not have anticipated its damaging effects.

The inadequacy of the certified question and the Florida Supreme Court's answer to it[5] was vividly recognized in our second opinion[6] after certification and answer. With the four jury interrogatory answers, F.R.Civ.P. 49(b),[7] which we then held were binding on a retrial, and the Florida answer to the certification that strict liability would exist even though the dangers of the product could not have been known to the prudent manufacturer, we had to face up to the now controlling issue of Florida law: whether the cigarettes were, on the trial record, unmerchantable as a matter of law because they were not reasonably fit and wholesome for their intended use, that is, to be smoked. Without a doubt the first trial record raised that question.

Indeed, following certification on our second decision we held[8] the evidence of causation more than ample. This evidence revealed the shocking medical opinion-fact that even with respect to "good" cigarettes—i. e., those manufactured in accordance with specifications and not "defective" from the presence of foreign matter—"the major factor that produces lung cancers in American males is smoking" and that "one in nine or ten" smokers does develop lung cancer. 325 F.2d 673, 676–678.

It remains the mystery wrapped in an enigma why we did not recertify an appropriate question to decide the issue that took a second expensive trial and a third expensive appeal, which produced a third decision[9] that is now supplanted by yet a fourth decision—the present opinion on rehearing en banc.

We know one thing for sure: no one knows just what the Supreme Court of Florida would say[10] about the wholesomeness of a product that in one out of ten users brings about the dreaded cancer. Of course Florida has a great stake in fashioning the products liability standards as a sanction to a strong judicial policy of protecting Floridians from the consequences of products of such portent.

2. Green v. American Tobacco Co., 5 Cir., 1962, 304 F.2d 70.

3. Green v. American Tobacco Co., 5 Cir., 1962, 304 F.2d 70, 85.

4. It is set out in our decision, Green v. American Tobacco Co., 5 Cir., 1963, 325 F.2d 673, 674.

5. Green v. American Tobacco Co., Fla., 1963, 154 So.2d 169.

6. Green v. American Tobacco Co., 5 Cir., 1963, 325 F.2d 673, 675–677.

7. See 304 F.2d at 85–86.

8. See 325 F.2d at 676–678.

9. Green v. American Tobacco Co., 5 Cir., 1968, 391 F.2d 97.

10. Judge Gewin has described this quest in Stool v. J. C. Penney Co., 5 Cir., 1968, 404 F.2d 562:
"We therefore fall back on formulary surrogates to account for our mysterious application of an uncoined code. Thus where the controlling state law eludes the researcher, the court must attempt to ascertain the policy inclination of the state's highest tribunal with regard to the matter in controversy.

\* \* \* \* \*

"It is nevertheless patent that any rule which we vicariously adopt on behalf of the state courts will be substantially the product of conjecture. Accordingly, we are hesitant to attempt to second-guess the district court which has already ventured intrepidly into the phantom-law wonderland. Since our view of the state law is probably as much a guess as the district court's, the latter cannot be designated categorically as wrong. Ironically enough, however, the district court can be erroneous. We cannot accept the premise that one guess is as good as another, for that would effectively eliminate appellate review in a substantial portion of the cases which come before this court."
404 F.2d at 563 (footnotes omitted).

Florida accepts without resistance or reluctance the now numerous cases we certify, and, as happened in this case,[11] its answers often demonstrate that we had indeed guessed incorrectly.[12] With this court so divided,[13] the minimum that should be done is to certify this now critical question to the Florida Supreme Court just as was done in effect by the Supreme Court's summary reversal of *Kaiser Steel,* supra (note 12). Florida has the right to determine for its ever increasing millions and for the millions of much coveted perennial visitors whether a product that dooms one in ten to the terrible disease can ever be fit or wholesome, reasonably or otherwise.

Only one further thing need be mentioned to placate those "pedagogical purists", *Kaiser Steel,* supra, 388 F.2d at 267 whose theme is a mixture of the worn-out claims that to decide and decide now is more important than to decide correctly, and that certification and other abstention devices are too time consuming and destine a case to an interminable career.

The fact is that in neither *Hopkins* nor *Martinez* (See note 12, supra) was the period of gestation from certification to answer nearly as long as the delay which this case has encountered in the course of its history in the federal courts.

My position, then, is a dual one. First I reject the idea that the enlightened Supreme Court of Florida will tolerate a commercial system that sells with impunity ostensibly innocuous products, but which in fact have lethal consequences.

Second, the question is so vital to Florida that the State should be given the opportunity to fashion its own policy standard through the available, workable mechanism of certification.

On all scores I therefore dissent.

---

11. Judge Rives in a wholesome exercise of self confession in the second opinion, 325 F.2d 673, 674, stated that the Florida answer "has saved this Court, through the writer as its organ, from committing a serious error as to the law of Florida which might have resulted in a grave miscarriage of justice."

12. See W. S. Ranch Co. v. Kaiser Steel Corp., 10 Cir., 1968, 388 F.2d 257, 264, n. 15, (dissenting opinion), reversed, 1968, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed. 2d 835; Martinez v. Rodriquez, 5 Cir.,

1968, 394 F.2d 156, 157 n. 2; Hopkins v. Lockheed Aircraft Corp., 5 Cir., 1966, 358 F.2d 347, which produced two divergent Florida opinions, 201 So.2d 743, on rehearing, 201 So.2d 749.

13. Judge Cameron dissented in the first two decisions, 304 F.2d 70, 77; 325 F.2d 673, 679. On the third appeal, Judges Coleman and Orie Phillips, Senior Judge of the Tenth Circuit found themselves in disagreement with Judge Simpson's momentary dissent. And now several others join the split.